## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JORGE PONCE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil No. 08-1028 (RMC) |
| v. | ) |
| | ) |
| JAMES H. BILLINGTON, | ) |
| Librarian, Library of Congress, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant James H. Billington, Librarian, Library of Congress, respectfully moves the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on Plaintiff's claims of race, national origin, and sex discrimination. Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.*, against the Library of Congress, alleging that Defendant discriminated against him on the bases of his race (Hispanic), national origin (Cuban-American), and sex (male) when it failed to select him for the position of Director for Workforce Diversity at the Library of Congress, and seeks injunctive and compensatory relief. Defendant moves for summary judgment on each of Plaintiff's discrimination claims on the grounds that there are no material facts in dispute and, as such, Defendant is entitled to judgment as a matter of law.

In support of this motion, Defendant submits the supporting memorandum of points and authorities and exhibits thereto, Local Rule 7(h) statement of material facts not in dispute, and a proposed order.

Date:  September 28, 2009                    Respectfully submitted,


  /s/
CHANNING D. PHILLIPS, D.C. Bar #415793
Acting United States Attorney

  /s/
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

  /s/ Michelle Lo
MICHELLE LO
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
Tel: (202) 514-5134   Fax: (202) 514-8780
Michelle.Lo2@usdoj.gov

*Of counsel:*
Felice D. Cherry, Esq.
Assistant General Counsel
Library of Congress

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JORGE PONCE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil No. 08-1028 (RMC) |
| v. | ) |
| | ) |
| JAMES H. BILLINGTON, | ) |
| Librarian, Library of Congress, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7(h), Defendant James H. Billington, Librarian, Library of Congress, respectfully submits the following statement of material facts as to which there is no genuine dispute:

1.    Plaintiff Jorge Ponce is currently employed as the Director of Policy and Evaluation Division within the Office of Civil Rights, U.S. Department of Commerce, a GS-15 position that he has held since April 2000. Ex. 1 at 8:14-25.

2.    Mr. Ponce identifies himself as a Hispanic, Cuban-American male. *See* Ex. 2.

3.    In June 2006, due to the impending retirement of Gilbert Sandate, the incumbent, the Library of Congress posted Vacancy Announcement No. 060157, Director for Office of Workforce Diversity, SL-0260. *See* Ex. 3.

4.    Plaintiff and Deborah Hayes both submitted applications for the Director for Office of Workforce Diversity position at the Library of Congress. Ex. 2; Ex. 4.

5.    Ms. Hayes is an African-American female. Compl. ¶ 19.

6.    At the time she applied for the Director for Office of Workforce Diversity

position, Ms. Hayes had been employed since May 2005 at the Library of Congress in a GS-15 position as the Chief of the Affirmative Action and Special Programs Office ("AASPO"), an office within the Office of Workforce Diversity.  Ex. 4 at p. 2.

7.     Prior to arriving at the Library of Congress, Ms. Hayes was employed from April 2000 to May 2005 as a senior EEO manager at the U.S. Department of Commerce, where she had primary responsibility for the Minority Serving Institution ("MSI") Program, served as the Department's point person in preparing reports to the White House initiative, and advised Department officials on MSI issues.  *See* Ex. 7 at 10:20-11:12; Ex. 1 at 18:13-19:19.

8.     Ms. Hayes has 28 years of federal service, with her career primarily focused on equal opportunity issues.  *See* Ex. 7 at 11:15-12:16.

9.     Mr. Sandate considered Ms. Hayes to have had approximately three years of supervisory experience at the time of the selection.  *See* Ex. 20 at 99:25-101:2.

10.     In accordance with the Library of Congress's Merit Selection Plan, applicants for the Director for Office of Workforce Diversity position were screened through the AVUE online application system for basic eligibility requirements for the position.  *See* Ex. 6 at p. 17 (VIII.E.1); *see also* Affidavit of Jewel Baldwin, Oct. 3, 2007 ("Baldwin Affid.") ¶ 8.

11.     Using the AVUE system, applicants rated themselves according to the KSAs (knowledge, skills, and abilities) the Library of Congress determined were required for the Director for Office of Workforce Diversity position.  *See* Ex. 6 at p. 12 (VIII.B.3) & p. 17 (VIII.E.1); Baldwin Affid. ¶ 8.

12.     After the closing of Vacancy Announcement No. 060157, the AVUE system then scored each application for the Director of Office of Workforce Diversity based on self-ratings

2

provided by the applicant for the KSAs used in the selection process.  *See* Ex. 6 at p. 12 (VIII.B.3) & p. 17 (VIII.E.1); Baldwin Affid. ¶ 8.

13.     Based on all the self-ratings provided by the applicants for each KSA on the online applications, the AVUE system generated an overall "cutoff score" recommendation of 100 as the minimum required score for a diverse pool of candidates to be referred for interview for the Director for Office of Workforce Diversity position.  Baldwin Affid. ¶ 11.

14.     In accordance with the Library of Congress Merit Selection Plan, Human Resources Specialist Jewel Baldwin reviewed the list of applicants eligible for interview referral for the Director for Office of Workforce Diversity position based on the AVUE-generated cutoff score to determine the degree of diversity of the interview referral pool as compared with the Library of Congress's Affirmative Action Plan underrepresentation data available for the position.  *See* Baldwin Affid. ¶ 11; Ex. 6 at p. 17 (VIII.E.2); Ex. 8.

15.     Ms. Baldwin determined that lowering the cutoff score for the Director for Office of Workforce Diversity position to 99 would allow for one additional Hispanic male and one additional Asian (both identified as underrepresented groups for the position series) to be referred for interview and advised then-Deputy Librarian, Gen. Donald Scott, the selecting official, accordingly.  Ex. 9; *see also* Ex. 8.

16.     Gen. Scott agreed to set the cutoff score for the position at 99.  Ex. 9; Baldwin Affid. ¶ 11.

17.     In July 2006, in accordance with the Library's Merit Selection Plan, Ms. Baldwin sent Gen. Scott an Interview Referral List, which contained the names of the 43 applicants who achieved the cutoff score of 99 (or above) through the AVUE application process for the

Director for Office of Workforce Diversity position. Ex. 10; *see also* Ex. 6 at p. 18 (VIII.E.3).

18.     Gen. Scott tasked Deanna Marcum, Associate Librarian for Library Services and Gilbert Sandate, the former Director of the Office of Workforce Diversity, as the two other members of the three-member interview panel for the Director for Office of Workforce Diversity position.  *See* Ex. 5 at 74:7-14.

19.     In accordance with the Library's Merit Selection Plan, the interview panel opted to conduct a "narrative/application review" of the Interview Referral List applications to determine whether the narrative portions of the applications corresponded with the self-ratings provided by the candidates for each KSA.  Baldwin Affid. ¶ 12; Ex. 6 at p. 18 (VIII.E.4).

20.     As a result of conducting the "narrative/application review," the interview panel was able to disqualify applicants whose narratives and applications reflected less than "Fully Acceptable" experience on one or more of the KSAs determined by the panel to be "critical." Ex. 6 at p. 18 (VIII.E.4).

21.     The narrative/application review resulted in 16 candidates being interviewed for the Director for Office of Workforce Diversity position.  Baldwin Affid. ¶ 12.

22.     The 16 final candidates were interviewed by a three-member interview panel that consisted of Gen. Scott, Ms. Marcum, and Mr. Sandate.  *See* Ex. 5 at 74:7-14.

23.     Each of the 16 final candidates interviewed for the Director for Office of Workforce Diversity position -- including Plaintiff and Ms. Hayes -- were asked the same questions related to the following KSAs during the candidate's interview: (1) Prior Experience and Background; (2) Knowledge of Federal Equal Employment Opportunity and Affirmative Action Laws, Regulations, Policies, and Procedures; (3) Ability to Lead and Manage Workforce

Diversity, Equal Employment Opportunity, Dispute Resolution, and Accommodation Programs in a Federal Environment; (4) Ability to Analyze Organizational and Operational Problems and Develop Solutions to Improve Business Performance; (5) Ability to Lead and Manage a Workforce; (6) Ability to Communicate in Writing; (7) Ability to Interact Collaboratively with Others; and (8) Ability to Communicate Orally. *See, e.g.*, Exs. 12-17.

24.     In accordance with the Library of Congress' Merit Selection Plan, each member of the interview panel independently scored each candidate interviewed for the Director for the Office of Workforce Diversity position according to each candidate's interview responses to the KSAs for the position.  Baldwin Affid. ¶ 14; Ex. 6 at p. 20 (VIII.E.5.e).

25.     The interview panel members did not discuss their ratings and justifications until all the interviews were concluded.  Baldwin Affid. ¶ 14; Ex. 6 at p. 20 (VIII.E.5.e).

26.     At the conclusion of all the interviews, in accordance with the Library of Congress' Merit Selection Plan, the interview panel members met with Ms. Baldwin as a group to discuss and resolve any major discrepancies between interview scores for the Director for Office of Workforce Diversity position.  Baldwin Affid. ¶ 15; Ex. 6 at p. 20 (VIII.E.5.e).

27.     There were no KSAs for which any of the interview panel members -- Gen. Scott, Ms. Marcum, or Mr. Sandate -- scored more than one point apart with respect to both Mr. Ponce and Ms. Hayes.  *See* Exs. 12-17.

28.     There was a general consensus among the interview panel members that Ms. Hayes had done very well in her interview, Ms. Hayes came across as articulate, and seemed to know what she was talking about.  *See* Ex. 20 at 90:1-9.

29.     Ms. Marcum recalled being "pleasantly surprised" by Ms. Hayes's interview performance, noting that "[t]he answers she gave verbally were more nuanced and thoughtful" than Ms. Hayes's written responses.  *See* Ex. 11 at 34:2-16.

30.     Gen. Scott recalled that Ms. Hayes was "articulate" and "upbeat" about her current position at the Library and recalled specific examples Ms. Hayes had provided about her accomplishments at the Department of Commerce and the Library.  *See* Ex. 5 at 80:11-82:11.

31.     Mr. Sandate, who was Ms. Hayes's direct supervisor while she served as Chief of AASPO, relayed to the other interview panel members that she had done a very good job in a short period of time in bringing together a series of functions that had been quite dysfunctional prior to the creation of the Office of Workforce Diversity, and had in very short order established written policies and procedures, developed performance plans for her employees, and basically rejuvenated that function and that division.  *See* Ex. 20 at 105:7-24.

32.     Mr. Sandate also found Ms. Hayes's best qualities as a manager to be her ability to assess a situation that needed to be addressed, bring together relevant stakeholders to address a problem area, devise a plan of action and then following through and implementing the plan of action.  *See* Ex. 20 at 105:25-106:12.

33.     At the conclusion of the interviews, Ms. Baldwin sent Gen. Scott a final referral list of the 16 remaining candidates for the Director for Office of Workforce Diversity position ranked by their final interview scores.  *See* Ex. 18.

34.     Both Ms. Hayes and Mr. Ponce were included in the final referral list.  *Id.*

35.     Ms. Hayes's final score on the interview was 3.1, which was the highest overall score of all the candidates for the Director for Office of Workforce Diversity position.  *Id.*

36.     Mr. Ponce and one other candidate received the second highest score on the interview, 2.9. *Id.*

37.     Based on her interview performance, her qualifications, feedback he received from Library managers about her work performance, and input from the two other members of the interview panel, Gen. Scott determined that Ms. Hayes would be the best fit to lead the Office of Workforce Diversity and deemed her to have "the most complete package that would help [the Library] continue on a very positive achievement path." *See* Ex. 5 at 108:5-109:5 & 132:15-134:13; Ex. 20 at 116:5-117:2.

38.     Gen. Scott ultimately selected Ms. Hayes for the Director for Office of Workforce Diversity position. *See* Ex. 19.

39.     When he inquired whether Mr. Sandate would agree with his selection, Mr. Sandate informed Gen. Scott that Ms. Hayes would be a good director, that he felt she could do the job, and that he "would certainly give him [Mr. Sandate's] concurrence for [Gen. Scott's] decision to select Ms. Hayes." *See* Ex. 20 at 116:5-117:2.

Date:  September 28, 2009                    Respectfully submitted,


              /s/
CHANNING D. PHILLIPS, D.C. Bar #415793
Acting United States Attorney


              /s/
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney


              /s/ Michelle Lo
MICHELLE LO
Assistant United States Attorney
Civil Division
555 4th Street, N.W.

7

Washington, D.C. 20530
Tel: (202) 514-5134   Fax: (202) 514-8780
Michelle.Lo2@usdoj.gov

*Of counsel:*
Felice D. Cherry, Esq.
Assistant General Counsel
Library of Congress

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JORGE PONCE,                  ) | |
|                    ) | |
|         Plaintiff,      ) | |
|                    )   Civil No. 08-1028 (RMC) | |
|         v.            ) | |

JORGE PONCE,                                )
                                            )
            Plaintiff,                      )
                                            )   Civil No. 08-1028 (RMC)
            v.                              )
                                            )
JAMES H. BILLINGTON,                        )
Librarian, Library of Congress,             )
                                            )
            Defendant.                      )
                                            )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant James H. Billington, Librarian, Library of Congress ("Defendant" or "Library"), respectfully moves the Court for summary judgment on Plaintiff Jorge Ponce's ("Plaintiff") claims of race, national origin, and sex discrimination. Plaintiff brings this action pursuant to the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.*, alleging that Defendant discriminated against him on the bases of his race (Hispanic), national origin (Cuban-American), and sex (male) when it failed to select him for the position of Director for Workforce Diversity at the Library of Congress in 2006. Defendant respectfully moves for summary judgment on Plaintiff's claims of race, national origin, and sex discrimination on the grounds that there are no issues of material fact and Defendant is entitled to judgment as a matter of law.

This is a straightforward case of a selecting official exercising his unfettered discretion in selecting the candidate he viewed as best qualified -- and also the candidate ranked highest by a three-person interview panel -- over Plaintiff, who had tied with another candidate for the second-highest ranking for the position of Director for Workforce Diversity at the Library of

Congress.  Unhappy at having lost out for the position to his former colleague, Deborah Hayes, Plaintiff asks this Court to function as a super-personnel department over the Library's personnel decision-making process and second-guess the Library's assessment of the relative qualifications of the candidates and its ultimate determination that Ms. Hayes was the best qualified candidate for the position.  Plaintiff claims, without any basis, that Defendant "should have known" that the selectee misrepresented her qualifications and that the only reason he was not selected for the position was due to unlawful discrimination.  To the contrary, the evidence shows that the selecting official, General Donald Scott, then-Deputy Librarian of Congress, made the determination to select Ms. Hayes to lead the Library's Office of Workforce Diversity based upon Ms. Hayes's interview performance, her qualifications, feedback he received from Library managers about her work performance, and input from the two other interview panel members. Hence, Defendant has asserted legitimate, non-discriminatory reasons for selecting Ms. Hayes for the position.  Further, Plaintiff cannot point to any evidence in the record that suggests that Defendant's asserted reasons for selecting Ms. Hayes (and, as a result, not selecting Plaintiff) are a pretext for discrimination.  Accordingly, this Court should grant summary judgment in favor of the Defendant.

## STATEMENT OF FACTS

Plaintiff is currently employed as the Director of the Policy and Evaluation Division within the Office of Civil Rights, U.S. Department of Commerce, a GS-15 position that he has held since April 2000.  Ex. 1 at 8:14-25.  Plaintiff identifies himself as a Hispanic, Cuban-American male.  Ex. 2.

The Library Issues A Vacancy Announcement for the
Director of Office of Workforce Diversity Position

In June 2006, due to the impending retirement of Gilbert Sandate, the incumbent, the Library of Congress posted Vacancy Announcement No. 060157, Director for Office of Workforce Diversity, SL-0260.   Ex. 3.   In June 2006, Plaintiff responded to the vacancy announcement and submitted an application for the Director for Office of Workforce Diversity position at the Library of Congress.   Ex. 2.   One of the other candidates for the Director for Office of Workforce Diversity position was Deborah Hayes.   Ex. 4.   Ms. Hayes is an African-American female.   Compl. ¶ 19.

At the time she applied for the Director for Office of Workforce Diversity position, Ms. Hayes had been employed since May 2005 at the Library of Congress in a GS-15 position as the Chief of the Affirmative Action and Special Programs Office ("AASPO"), an office within the Office of Workforce Diversity.   Ex. 4 at p. 2.   Ms. Hayes had also been performing as Acting Director of the Office of Workforce Diversity for approximately one-and-a-half months during the June to August 2006 period between Mr. Sandate's retirement and her selection for the Director position.   Ex. 5 at 106:15-107:8.

Prior to arriving at the Library of Congress, Ms. Hayes was employed from April 2000 to May 2005 as a senior EEO manager at the U.S. Department of Commerce, where she had primary responsibility for the Minority Serving Institution ("MSI") Program, served as the Department's point person in preparing reports to the White House initiative, and advised Department officials on MSI issues.   Ex. 7 at 10:20-11:12; Ex. 1 at 18:13-19:19.   From July 1998 to April 2000, Ms. Hayes served as Acting Chief of the Plans and Program Teams at the Defense Intelligence Agency.   Ex. 4 at pp. 2-3.   Ms. Hayes has 28 years of federal service, with her career

3

primarily focused on equal opportunity efforts.  Ex. 7 at 11:15-12:16.  Based on her resume, Mr. Sandate considered Ms. Hayes to have had approximately three years of supervisory experience at the time of the selection.  Ex. 20 at 99:25-101:2.

The Selection Process for the<br>Director of the Office of Workforce Diversity Position

In accordance with the Library of Congress's Merit Selection Plan, applicants for the Director for Office of Workforce Diversity position were screened through the AVUE online application system for basic eligibility requirements for the position. Ex. 6 at p. 17 (VIII.E.1); *see also* Affidavit of Jewel Baldwin, Oct. 3, 2007 ("Baldwin Affid.") ¶ 8.  Using the AVUE system, applicants rated themselves according to the KSAs (knowledge, skills, and abilities) the Library of Congress determined were required for the Director for Office of Workforce Diversity position.  Ex. 6 at p. 12 (VIII.B.3) & p. 17 (VIII.E.1); Baldwin Affid. ¶ 8.  After the closing of Vacancy Announcement No. 060157, the AVUE system then scored each application for the Director of Office of Workforce Diversity position based on self-ratings provided by the applicant for the KSAs used in the selection process.  *Id.*

Based on the self-ratings provided by the applicants for each KSA on the online applications, the AVUE system generated an overall "cutoff score" recommendation of 100 as the minimum required score for a diverse pool of candidates to be referred for interview for the Director for Office of Workforce Diversity position.  Baldwin Affid. ¶ 11.  In accordance with the Library of Congress Merit Selection Plan, Human Resources Specialist Jewel Baldwin reviewed the list of applicants eligible for interview referral for the Director for Office of Workforce Diversity position based on the AVUE-generated cutoff score to determine the degree of diversity of the interview referral pool as compared with the Library of Congress's

Affirmative Action Plan underrepresentation data available for the position.  *See* Baldwin Affid. ¶ 11; Ex. 6 at p. 17 (VIII.E.2); Ex. 8.

Ms. Baldwin determined that lowering the cutoff score for the Director for Office of Workforce Diversity position to 99 would allow for one additional Hispanic male and one additional Asian (both identified as underrepresented groups for the position series) to be referred for interview and advised then-Deputy Librarian, Gen. Donald Scott, the selecting official, accordingly.  Ex. 9; *see also* Ex. 8.  As a result, Gen. Scott agreed to set the cutoff score for the position at 99.  Ex. 9; Baldwin Affid. ¶ 11.

<u>The Interview Process for Director of the Office of Workforce Diversity Position</u>

In July 2006, in accordance with the Library's Merit Selection Plan, Ms. Baldwin sent Gen. Scott an Interview Referral List, which contained the names of the 43 applicants who achieved the cutoff score of 99 (or above) through the AVUE application process for the Director for Office of Workforce Diversity position.  Ex. 10; *see also* Ex. 6 at p. 18 (VIII.E.3). Gen. Scott tasked Deanna Marcum, Associate Librarian for Library Services and Gilbert Sandate, the former Director of the Office of Workforce Diversity, as the two other members of the three-member interview panel for the Director for Office of Workforce Diversity position. Ex. 5 at 74:7-14.  Gen. Scott is an African-American male.  Compl. ¶ 18.  Ms. Marcum is a White female.  Ex. 11 at 13:8-11.  Mr. Sandate is a Hispanic male.  *Id.* at 18:1-8.

In accordance with the Library's Merit Selection Plan, the interview panel opted to conduct a "narrative/application review" of the Interview Referral List applications to determine whether the narrative portions of the applications corresponded with the self-ratings provided by the candidates for each KSA.  Baldwin Affid. ¶ 12; Ex. 6 at p. 18 (VIII.E.4).  As a result of

conducting the "narrative/application review," the interview panel was able to disqualify applicants whose narratives and applications reflected less than "Fully Acceptable" experience on one or more of the KSAs determined by the panel to be "critical." Ex. 6 at p. 18 (VIII.E.4). Utilizing the narrative/application review process, the interview panel was able to winnow the number of candidates to be interviewed for the Director position from 43 to 16 candidates. Baldwin Affid. ¶ 12.

The 16 final candidates -- which included Plaintiff and Ms. Hayes -- were interviewed by a three-member interview panel that consisted of Gen. Scott, Ms. Marcum, and Mr. Sandate. *See* Ex. 5 at 74:7-14. In accordance with the Library's Merit Selection Plan, each of the 16 final interview candidates were asked the same questions related to the following KSAs during the candidate's interview: (1) Prior Experience and Background; (2) Knowledge of Federal Equal Employment Opportunity and Affirmative Action Laws, Regulations, Policies, and Procedures; (3) Ability to Lead and Manage Workforce Diversity, Equal Employment Opportunity, Dispute Resolution, and Accommodation Programs in a Federal Environment; (4) Ability to Analyze Organizational and Operational Problems and Develop Solutions to Improve Business Performance; (5) Ability to Lead and Manage a Workforce; (6) Ability to Communicate in Writing; (7) Ability to Interact Collaboratively with Others; and (8) Ability to Communicate Orally. *See, e.g.*, Exs. 12-17. Gen. Scott, Ms. Marcum, and Mr. Sandate each took notes during the candidates' interviews which reflected the substance of what was discussed during those interviews. *See id.*

In accordance with the Library of Congress' Merit Selection Plan, each member of the interview panel independently scored each candidate interviewed for the Director for the Office

of Workforce Diversity position according to each candidate's interview responses to the KSAs for the position.  Baldwin Affid. ¶ 14; Ex. 6 at p. 20 (VIII.E.5.e).  The interview scores are based on a five point scale (4 = Outstanding, 3 = Superior, 2 = Fully Acceptable, 1 = Less than Fully Acceptable; 0 = No Evidence of Experience).  Ex. 6 at p. 20 (VIII.E.5.e).  Further in accordance with the Library's Merit Selection Plan, the interview panel members did not discuss their independent ratings and justifications until all the interviews were concluded.  Baldwin Affid. ¶ 14; Ex. 6 at p. 20 (VIII.E.5.e).

At the conclusion of all the interviews, in accordance with the Library of Congress' Merit Selection Plan, the interview panel members met with Ms. Baldwin as a group to discuss and resolve any major discrepancies between interview scores for the Director for Office of Workforce Diversity position.  *See* Baldwin Affid. ¶ 15; Ex. 6 at VIII.E.5.e.  There were no KSAs for which any of the interview panel members -- Gen. Scott, Ms. Marcum, or Mr. Sandate -- scored more than one point apart with respect to both Plaintiff and Ms. Hayes.  *See, e.g.*, Exs. 12-17.

There was a general consensus among the interview panel members that Ms. Hayes had done very well in her interview, Ms. Hayes came across as articulate, and seemed to know what she was talking about.  Ex. 20 at 90:1-9.  Ms. Marcum recalled being "pleasantly surprised" by Ms. Hayes's interview performance, noting that "[t]he answers she gave verbally were more nuanced and thoughtful" than Ms. Hayes's written responses.  Ex. 11 at 34:2-16.  Gen. Scott recalled that Ms. Hayes was "articulate" and "upbeat" about her current position at the Library and recalled specific examples Ms. Hayes had provided about her accomplishments at the Department of Commerce and the Library.  Ex. 5 at 80:11-82:11.  Mr. Sandate, who was Ms.

Hayes's direct supervisor while she served as Chief of AASPO, relayed to the other interview panel members that she had done a very good job in a short period of time in bringing together a series of functions that had been quite dysfunctional prior to the creation of the Office of Workforce Diversity, and had in very short order established written policies and procedures, developed performance plans for her employees, and basically rejuvenated that function and that division. Ex. 20 at 105:7-24. Mr. Sandate also found Ms. Hayes's best qualities as a manager to be her ability to assess a situation that needed to be addressed, bring together relevant stakeholders to address a problem area, devise a plan of action and then following through and implementing the plan of action. *Id.* at 105:25-106:12.

Gen. Scott Selects Deborah Hayes for the<br>Director for the Office of Workforce Diversity Position

At the conclusion of the interviews, in August 2006, Ms. Baldwin sent Gen. Scott a final referral list of the 16 remaining candidates for the Director for Office of Workforce Diversity position ranked by their final overall interview scores. Ex. 18. Based on their final overall interview scores, both Ms. Hayes and Plaintiff were included in the final referral list Ms. Baldwin provided to Gen. Scott in August 2006 for the Director for Workforce Diversity position. *See id.*

Ms. Hayes's final overall score on the interview was 3.1, which was the highest overall score of all the candidates for the Director for Office of Workforce Diversity position. *Id.* Mr. Ponce and one other candidate received the second highest overall score on the interview, 2.9. *Id.* Based on her interview performance, her qualifications, feedback he received from Library managers about her work performance, and input from the two other members of the interview panel, Gen. Scott determined that Ms. Hayes would be the best fit to lead the Office of

8

Workforce Diversity and deemed her to have "the most complete package that would help [the Library] continue on a very positive achievement path." Ex. 5 at 108:5-109:5 & 132:15-134:13; Ex. 20 at 116:5-117:2. Gen. Scott ultimately selected Ms. Hayes for the Director for Office of Workforce Diversity position. Ex. 19. When he inquired whether Mr. Sandate would agree with his selection, Mr. Sandate informed Gen. Scott that Ms. Hayes would be a good director, that he felt she could do the job, and that Mr. Sandate "would certainly give him [Mr. Sandate's] concurrence for [Gen. Scott's] decision to select Ms. Hayes." Ex. 20 at 116:5-117:2.

Plaintiff Alleges Discrimination When Ms. Hayes Is Selected for<br>the Director Position and Plaintiff Is Not Selected

In November 2006, Plaintiff filed a formal discrimination complaint with the Library of Congress in which he alleged that he was discriminated against on the basis of his race, national origin, age, and sex when he was not selected for the Director for Office of Workforce Diversity position. *See* Compl.

## STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). In determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The party seeking summary judgment must demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 248. A genuine issue of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Once the moving party has met its burden, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but must instead establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, [the Rule 56] standard compels summary judgment if the non-moving party rests merely upon conclusory allegations, improbable inferences and unsupported speculation." *Spiegel v. Leavitt*, No. 01-2195, 2005 WL 2402322, at *8 (D.D.C. Sept. 22, 2005); *Brown v. Brody*, 199 F.3d 446, 458-59 (D.C. Cir. 1999) (plaintiff's own speculation and allegations do not overcome a defendant's motion for summary judgment).

## ARGUMENT

## I.     DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RACE, NATIONAL ORIGIN, AND SEX DISCRIMINATION CLAIM

In cases where, as here, the record is devoid of direct evidence of discrimination, a court will analyze a plaintiff's circumstantial evidence of intentional discrimination using the three-part burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).[1] Under this framework, the plaintiff has the initial burden of establishing by a

---

[1]     The *McDonnell Douglas* framework for testing the viability of plaintiff's circumstantial evidence applies to both theories of liability for intentional discrimination: (1) the single motive theory requiring that the plaintiff establish that discrimination was the "sole" or "but for" reason for the challenged employment action; and (2) the "mixed-motive" theory requiring only that the plaintiff demonstrate that discrimination played a "motivating part" or was a "substantial factor" in the employment decision. *See Fogg v. Gonzales*, 492 F.3d 447, 451 (D.C. Cir. 2007). It appears that Plaintiff intended to bring his discrimination claims under the single-motive theory, and so Defendant analyzes Plaintiff's claims accordingly. Plaintiff cannot prevail under either

10

preponderance of the evidence a *prima facie* case of discrimination.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).  To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Hendricks v. Paulson*, 520 F. Supp. 2d 65, 87 (D.D.C. 2007) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).  If the plaintiff succeeds in establishing a *prima facie* case, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action.  *See McDonnell Douglas*, 411 U.S. at 802.  Once it is established that the parties have met their respective burdens of production (*i.e.*, plaintiff by presenting a *prima facie* case and defendant by producing a non-discriminatory reason for its actions), the *McDonnell Douglas* framework disappears and "the sole remaining issue is discrimination *vel non*."  *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (internal citations omitted).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all time with the plaintiff."  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  Plaintiff must meet this "ultimate burden" by demonstrating that the defendant's proffered legitimate, non-discriminatory reason is a pretext and that discrimination is the "but for" reason for the challenged employment action.  *See Hicks*, 509 U.S. at 515-18.

The D.C. Circuit clarified the application of the *McDonnell Douglas* framework in *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008).  In *Brady*, the D.C. Circuit held that where an employee has suffered an adverse employment decision and the employer has

---

theory, however, as the undisputed facts show that Plaintiff cannot establish that discrimination was a motivating factor – much less the sole motivating factor – behind the challenged actions.

articulated a legitimate non-discriminatory reason for its actions, the court "need not -- *and should not* -- decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*." *Id.* at 494 (emphasis in original). Instead, the court must focus on one central question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee." *Id.*; *Short v. Chertoff*, 555 F. Supp. 2d 166, 172 (D.C. Cir. 2008). An employer's asserted reason "cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, and that discrimination was the real reason." *Hicks*, 509 U.S. at 502, 515 (emphasis in original). "It is not enough, in other words, to disbelieve the employer, the fact finder must believe the plaintiff's explanation of intentional discrimination." *Id.* at 519. Plaintiff bears the ultimate burden of persuasion on the issue of whether he was intentionally discriminated against. *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

As demonstrated below, the undisputed facts illustrate that Plaintiff here fails to meet his burden of coming forward with evidence to create a triable issue. Applying the central question posed in *Brady*, Plaintiff cannot demonstrate that discrimination was a motivating factor, much less the sole motivating factor, in his non-selection for the Director for Office of Workforce Diversity position because: (1) Defendant has asserted a legitimate, non-discriminatory reason for the non-selection; and (2) there is nothing in the record that suggests that Defendant's asserted reason is a pretext for discrimination.

**A.      Defendant Has Asserted A Legitimate, Non-Discriminatory Reason for
Plaintiff's Non-Selection Based on Ms. Hayes's Superior Interview
Performance**

At the conclusion of the interviews, in August 2006, Ms. Baldwin sent Gen. Scott a final

referral list of the 16 remaining candidates for the Director for Office of Workforce Diversity

position, ranked by their final overall interview scores.  *See* Ex. 18.  Based on their final overall

interview scores, both Ms. Hayes and Plaintiff were included in the final referral list Ms.

Baldwin provided to Gen. Scott in August 2006 for the Director for Workforce Diversity

position.  *Id.*  Ms. Hayes's final score on the interview was 3.1, which was the highest overall

score of all the candidates for the Director for Office of Workforce Diversity position.  Plaintiff

and one other candidate received the second highest score on the interview, 2.9.  *Id.*  Gen. Scott

ultimately selected Ms. Hayes for the Director for Office of Workforce Diversity position.  Ex.

19.  Gen. Scott based his selection of Ms. Hayes upon his review of her qualifications and

interview performance, feedback he received from managers at the Library, input from other

members of the interview panel, his determination that she would be the best fit to lead the

Office of Workforce Diversity, and his overall assessment that she had "the most complete

package that would help [the Library] continue on a very positive achievement path."  Ex. 5 at

108:5-109:5 & 132:15-134:13.

As the evidence reflects, there was a general consensus among the interview panel

members that Ms. Hayes had done very well in her interview, Ms. Hayes came across as

articulate, and seemed to know what she was talking about.  Ex. 20 at 90:1-9.  All three interview

panelists were impressed by Ms. Hayes's interview performance, characterizing her responses as

"nuanced and thoughtful," "articulate," and well supported by specific examples of her

achievements at the Department of Commerce and at the Library.  Ex. 11 at 34:2-16; Ex. 5 at 80:11-82:11.  The positive impression that Gen. Scott received was further bolstered by feedback he received regarding Ms. Hayes's performance during her tenure at the Library.  Mr. Sandate, who was Ms. Hayes's direct supervisor while she served as Chief of AASPO, relayed to the other interview panel members that she had done a very good job in a short period of time in bringing together a series of functions that had been quite dysfunctional prior to the creation of the Office of Workforce Diversity, and had in very short order established written policies and procedures, developed performance plans for her employees, and basically rejuvenated that function and that division.  Ex. 20 at 105:7-24.  Mr. Sandate also found Ms. Hayes's best qualities as a manager to be her ability to assess a situation that needed to be addressed, bring together relevant stakeholders to address a problem area, devise a plan of action and then following through and implementing the plan of action.  Ex. 20 at 105:25-106:12.

Thus, based upon his assessment of the relative qualifications of the final candidates, Gen. Scott made the determination that, in his judgment, Ms. Hayes was the best qualified candidate for the Director position.

**B.     Plaintiff Cannot Show That Defendant's Legitimate, Non-Discriminatory Reason for the Non-Selection Is Pretext for Discrimination**

As explained above, the Library has articulated legitimate, non-discriminatory reasons for why it selected Ms. Hayes.  Plaintiff cannot adduce any evidence showing that the reasons Defendant asserts for Ms. Hayes's selection were pretextual and that the real reason for not selecting him was because of his race, national origin, and/or sex.  To establish pretext in a non-selection case, a plaintiff must show that he was "significantly better qualified for the job" than the ultimate selectee.  *Washington v. Chao*, 577 F. Supp. 2d 27, 43-44 (D.D.C. 2008); *Holcomb*

*v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006).  This "qualifications gap must be 'great enough to be inherently indicative of discrimination.'"  *Adeyemi v. Dist. of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008).  This Plaintiff cannot do.

> 1.  *Plaintiff's Self-Serving Contention That He Was "Significantly Better Qualified for the Job" Fails to Establish Pretext*

As stated above, Plaintiff was not selected for the Director for Office of Workforce Diversity position for a simple, straightforward, non-discriminatory reason:  Gen. Scott deemed Ms. Hayes to be the most qualified candidate for the position and deemed her to have "the most complete package that would help [the Library] continue on a very positive achievement path." Ex. 5 at 108:5-109:5 & 132:15-134:13.

Plaintiff's self-serving assertion that his credentials were superior to that of the selectee is irrelevant for purposes of establishing discriminatory conduct.  *See Waterhouse v. Dist. of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) ("'[P]laintiff's perception of himself, and of his work performance, is not relevant.  It is the perception of the decisionmaker which is relevant.'") (quoting *Smith v. Chamber of Commerce*, 645 F. Supp. 604, 608 (D.D.C. 1986)); *Talavera v. Fore*, No. 07-0720 (JDB), 2009 WL 2731275, at *15 (D.D.C. Aug. 31, 2009).  While Defendant does not dispute that Plaintiff was a qualified candidate for the Director position, Gen. Scott also found Ms. Hayes to be just as qualified a candidate and, at the conclusion of the selection process, determined that she was, in his judgment, the best qualified candidate for the position. *See Holcomb*, 433 F.3d at 897-98 (finding that although plaintiff's qualifications were "impressive," evidence failed to establish that plaintiff's qualifications were "sufficiently superior" to those of selectee to permit a jury to infer discrimination); *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003) (affirming summary judgment in non-selection case where

plaintiff's evidence presented "no such stark superiority of credentials over those of the successful candidates").

At the time she applied for the Director for Office of Workforce Diversity position, Ms. Hayes had been employed since May 2005 at the Library of Congress in a GS-15 position as the Chief of the Affirmative Action and Special Programs Office ("AASPO"), an office within the Office of Workforce Diversity.  Ex. 4 at p. 2.  Ms. Hayes had also been performing as Acting Director of the Office of Workforce Diversity for one-and-a-half months during the June to August 2006 period between Mr. Sandate's retirement and her selection for the Director position. *See* Ex. 5 at 106:15-107:8.  Prior to arriving at the Library of Congress, Ms. Hayes was employed from April 2000 to May 2005 as a senior EEO manager at the U.S. Department of Commerce, where she had primary responsibility for the Minority Serving Institution ("MSI") Program, served as the Department's point person in preparing reports to the White House initiative, and advised Department officials on MSI issues.  *See* Ex. 7 at 10:20-11:12; Ex. 1 at 18:13-19:19.  From July 1998 to April 2000, Ms. Hayes served as Acting Chief of the Plans and Program Teams at the Defense Intelligence Agency.  *See* Ex. 4 at pp. 2-3.  In total, Ms. Hayes had 28 years of federal service, with her career primarily focused on equal opportunity issues. *See* Ex. 7 at 11:15-12:16.  Mr. Sandate considered Ms. Hayes to have had approximately three years of supervisory experience at the time of the selection.  *See* Ex. 20 at 99:25-101:2.[2]

---

[2]   Despite Plaintiff's claims that Defendant "should have known" that Ms. Hayes allegedly "greatly exaggerated her skills and experience on her application for the position," *see* Compl. ¶ 23, Plaintiff cannot point to any evidence in the record that would support either the allegation that Defendant "should have known" or that Ms. Hayes "greatly exaggerated" her skills and experience.  To wit, during the selection process for the Chief of AASPO position, Mr. Sandate conducted a reference check on Ms. Hayes with Plaintiff, who was Ms. Hayes's then-supervisor at the Commerce Department.  Ex. 20 at 121:19-122:24.  Mr. Sandate received favorable

Following the interviews, there was a general consensus among the panel members that Ms. Hayes had done very well in her interview, Ms. Hayes came across as articulate, and seemed to know what she was talking about.  *See* Ex. 20 at 90:1-9.   Ms. Marcum was "pleasantly surprised" by Ms. Hayes's interview performance, noting that "[t]he answers she gave verbally were more nuanced and thoughtful" than Ms. Hayes's written responses.  *See* Ex. 11 at 34:2-16. Gen. Scott recalled that Ms. Hayes was "articulate" and "upbeat" about her current position at the Library and recalled specific examples Ms. Hayes had provided about her accomplishments at the Department of Commerce and the Library.  *See* Ex. 5 at 80:11-82:11.

In addition to the very positive feedback that the interview panels received from Mr. Sandate regarding Ms. Hayes's performance as Chief of AASPO, Gen. Scott had also received feedback from Library managers that Ms. Hayes was very forthcoming in helping them resolve issues.   *See* Ex. 20 at 105:7-24; Ex. 5 at 83:1-12.   Thus, there is nothing in the record that suggests that Gen. Scott did not honestly believe:  (1) that Ms. Hayes had a better understanding of what would be required of the Office of Workforce Diversity than Plaintiff; and thus, (2) that Ms. Hayes was more deserving than all other candidates, including Plaintiff, of selection to the Director position.  *See Fischbach v. Dist. of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Once the employer has articulated a non-discriminatory explanation for its action, the issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers.'").

Based upon the foregoing reasons, Gen. Scott ultimately selected Ms. Hayes for the Director for Office of Workforce Diversity position.  *See* Ex. 19.   When he inquired whether Mr.

---

feedback from Plaintiff on Ms. Hayes's performance; he did not ever receive any information that gave him concern about Ms. Hayes's credentials.  *Id.* at 121:19-122:24, 123:23-124:2.

Sandate would agree with his selection, Mr. Sandate informed Gen. Scott that Ms. Hayes would be a good director, that he felt she could do the job, and that he "would certainly give him [Mr. Sandate's] concurrence for [Gen. Scott's] decision to select Ms. Hayes." *See* Ex. 20 at 116:5-117:2.[3]  In sum, given the strength of Defendant's legitimate, non-discriminatory/non-retaliatory reason for Plaintiff's non-selection, the absence of evidence of pretext, no reasonable jury could conclude that the non-selection at issue was the product of discrimination on the bases of Plaintiff's race, national origin, and/or sex.

> 2.  *Plaintiff Fails to Establish Pretext by Pointing to the Library's Affirmative Action Plan*

Plaintiff apparently contends that because the Library's Affirmative Action Recruitment Plan indicated an underrepresentation of Hispanic males at senior levels, the non-selection of Plaintiff, a Hispanic male, is evidence of pretext.  *See* Compl. ¶ 24.  While the Library's Affirmative Action Recruitment Plan may have indicated an underrepresentation of Hispanic males at senior levels,[4] "statistical evidence is only one small part of a substantial web of evidence indicating pretext."  *See Talavera*, 2009 WL 2731275, at *11 (finding records reflecting an agency's "tendency to promote men" insufficient to show discriminatory intent at

---

[3]   Gen. Scott testified that had Mr. Sandate recommended another candidate to serve as his replacement, it is likely he would have gone along with Mr. Sandate's recommendation given his esteem for Mr. Sandate.  *See* Ex. 5 at 87:21-90:5.  Mr. Sandate did not, however, register any objection to Gen. Scott's decision to select Ms. Hayes, but in fact concurred in the decision.  *See* Ex. 20 at 116:5-117:2.  Thus, there is nothing in the record that would suggest that Gen. Scott did not honestly believe in the reasons he offered.

[4]   The Library's Affirmative Action Recruitment Plan, however, although noting such underrepresentation, does not, and cannot, attribute the cause of such underrepresentation.  *See* Ex. 8.  Thus, because the Recruitment Plan does not account for the makeup of relevant applicant pools, its statistics is of little to no probative value.  *See Talavera*, 2009 WL 2731275, at *11; *Krodel*, 748 F.2d at 710; *Simpson*, 437 F. Supp. 2d at 104.

18

the summary judgment stage); *see also Krodel v. Young*, 748 F.2d 701, 710 (D.C. Cir. 1984) (finding that statistical evidence is generally "less significant" in disparate treatment cases); *Simpson v. Leavitt*, 437 F. Supp. 2d 95, 104 (D.D.C. 2006) (finding that statistical evidence "alone is insufficient to create an inference of disparate treatment"). No such web of evidence, substantial or otherwise, exists here.[5] To the contrary, the evidence shows that the purpose of the Recruitment Plan was "to attract qualified applicants to the vacancy, including members of the under-represented groups." *See* Ex. 6 at p. 11 (VIII.A.5). The issue of underrepresentation in recruitment was addressed during the selection process when Ms. Baldwin determined that lowering the cutoff score for the Director for Office of Workforce Diversity position to 99 would allow for one additional Hispanic male and one additional Asian candidate (both identified as underrepresented groups for the position series) to be referred for interview and advised then-Deputy Librarian, Gen. Donald Scott, the selecting official, accordingly. Ex. 9; *see also* Ex. 8. Ultimately, Gen. Scott made a final determination based on his assessment of the relative qualifications of the diverse pool of candidates.

In sum, because Defendant's legitimate, non-discriminatory reason for the non-selection is compelling, and because Plaintiff cannot point to any evidence of pretext in the record, no reasonable jury could conclude that his non-selection for the Director of Workforce Diversity position was discriminatory. Accordingly, Plaintiff's claims for race, national origin, and sex discrimination must fail.

---

[5] Plaintiff also contends that Defendant failed to "remedy the situation by selecting Plaintiff for the job instead" once Ms. Hayes resigned from the Director of Office of Workforce Diversity position in February 2008. *See* Compl. ¶¶ 37 & 46. Plaintiff has not, however, adduced any evidence that would support his theory that the Library could have and should have filled the position following Ms. Hayes's departure simply by selecting a candidate from the Final Referral List developed in August 2006.

## CONCLUSION

The Library has articulated its legitimate, non-discriminatory reason for not selecting Plaintiff for the Director for the Office of Workforce Diversity Position, and Plaintiff cannot bring forth any evidence that would establish the existence of any material fact in dispute or that would call into question Defendant's reasons for the employment action he challenges.  It is well-established that personal speculation and subjective judgment of illegal motivation do not create a factual issue precluding summary judgment.  *Brown v. Brody*, 199 F.3d 446, 458-59 (D.C. Cir. 1999) (plaintiff's own speculation and allegations do not overcome a defendant's motion for summary judgment).   Thus, Defendant respectfully requests that the Court grant his motion for summary judgment.

Date:  September 28, 2009                    Respectfully submitted,


　/s/
CHANNING D. PHILLIPS, D.C. Bar #415793
Acting United States Attorney


　/s/
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney


　/s/ Michelle Lo
MICHELLE LO
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
Tel: (202) 514-5134   Fax: (202) 514-8780
Michelle.Lo2@usdoj.gov


*Of counsel:*
Felice D. Cherry, Esq.
Assistant General Counsel
Library of Congress

20