# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JORGE PONCE,

      Plaintiff,

        v.

JAMES H. BILLINGTON,
Librarian, United States Library of Congress

      Defendant.

C.A. No.  08-1028 (RMC)

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Court must deny Defendant's motion for summary judgment in its entirety. Defendant conveniently ignores all of the many facts in dispute in this employment discrimination matter.  This case is wholly inappropriate for summary disposition and must instead be heard by a jury.

This case concerns the Library of Congress' non-selection of Plaintiff, an Hispanic male, in favor of Deborah Hayes, an African American female for the top-level EEO Director position. The case is heavily fact-laden, with many material inconsistencies that were previously highlighted by the administrative investigative report in the matter.  Defendant, who wishes to bypass Plaintiff's right to have a jury determine the truth of this matter, makes only two arguments, both of which should be rejected by this Court.  Defendant first argues that management's decision was non-discriminatory because it selected Ms. Hayes based on a discretionary and subjective judgment call.  This decision was based, ultimately not on the paper record but on the putative performance in the interviews.  In resting its decision on a wholly

subjective element of the selection process, Defendant ignores the compelling evidence of

Plaintiff's far superior qualifications for the job, the selecting official's lack of credibility, and

the selectee's massive misrepresentations of her credentials.  This is far and away ample

evidence for a jury to find that Defendant's explanation was pretextual.

The Court must also reject Defendant's second argument that the Court should disregard

the Affirmative Action report, which attests to an underrepresentation of Hispanic males at the

senior level at the Library.  Defendant has no explanation as to why this clearly relevant

evidence should be disregarded.  It is undisputed that the selecting official discussed this very

report and the underrepresentation of Hispanic males during the selection process.  The

consideration of the report, or lack thereof, by the selecting official must be a matter for the jury

to weigh.  For all of these reasons and those in the supporting statement of material facts in

dispute, the Court must deny Defendant's motion in its entirety.

## I. STATEMENT OF FACTS

This case involves Plaintiff Jorge Ponce's 2006 non-selection for a senior level position

at the Library of Congress as the Director of Workforce Diversity.  Plaintiff, an Hispanic male,

applied for the job, but was not selected in favor of Deborah Hayes, an African American female

with far less experience.  Indeed, for five of the six prior years, Mr. Ponce had been Ms. Hayes'

supervisor.  Ms. Hayes was so under-qualified for the senior level position that the Defendant

proposed her demotion from the senior level less than a year into her tenure in the job.

A.      <u>Plaintiff's Qualifications</u>

2

It is undisputed that Plaintiff was preeminently qualified for the Director position at the Library of Congress.  During the time period relevant to this complaint, Mr. Ponce worked for the Department of Commerce as the Director of the Policy and Evaluation Division within the Office of Civil Rights, a GS-15 position. Ex. 1 (Application of Jorge Ponce). At the time of his application, he had held that position at the GS-15 level for nearly six years.  *Id.*  Mr. Ponce had extensive direct supervisory responsibilities in the position, supervising five Equal Employment Opportunity (EEO) managers (including the selectee, Ms. Hayes) and two other administrative employees.  *Id.*  His main duties included developing policy statements, guidelines and procedures to comply with EEO laws and regulations.  *Id.*  He also prepared briefings for high-level Department of Commerce senior level executives on numerous civil rights issues and policies.  *Id.*  Plaintiff developed policies and procedures for countless programs such as Disability programs, Minority Serving Institutions, and Affirmative Employment programs.  *Id.* He advised Commerce employees and managers on ADA reasonable accommodation policies and procedures, drafted Equal Employment Opportunity Commission (EEOC) reports, plans, and plan updates, and prepared various handbooks and policy statements on topics ranging from ADR to the Disabled Veterans Affirmative Action Program and the Federal Equal Opportunity Recruitment Program. *Id.* at 2.

In addition to his high-level years of experience in the EEO field, Plaintiff was especially suited for the position at the Library of Congress.  Unlike any of the other candidates for the job, he held a Master's Degree in Library Science.  *Id.* at 4.  He had served in various federal positions since graduating in 1978, first in library sciences, but then spending the majority of his career in the EEO and diversity management fields.  In 1988, he became an EEO Specialist, GS-

12, at the U.S. Government Printing Office where he served as a EEO counselor, wrote agency

decisions, conducted EEO and sexual harassment training for managers, trained staff on EEO

issues, and provided technical advice to employees, executives and managers on EEO

matters. *Id.* at 3.  From 1993 to 2000, Plaintiff was an EEO Specialist at the U.S. Department of

Treasury, GS-14, where, among other things, he managed and developed policy for three

diversity/affirmative action programs for Treasury's thirteen bureaus, covering 158,000

employees.  *Id.* at 2-3.  He achieved a GS-15 in 2000 when he went to work at the Department of

Commerce in the position he still holds.

Throughout his career, Plaintiff was recognized for his performance and his detailed

knowledge and understanding of EEO and diversity programs.  *See id.* at 4.  At the time of his

application, he had received an Outstanding Supervisory Performance Award in multiple years at

the Department of Commerce and the Secretary of the Treasury Award in 2000.  *Id*. at 4.  He was

also elected and served as the Vice-Chair of the Council of Federal EEO and Civil Rights

Executives in 1997-98 and 1999-2000, and co-Chair from 2001 the 2004 terms.  *Id.*  Plaintiff

was frequently quoted in various publications and articles concerning EEO matters, including

LRP's Federal EEO Advisor, the FPMI's Federal EEO Update, the LRP's Federal Equal

Opportunity Reporter, and Profiles in Diversity Journal.  *Id.*

B.    <u>Ms. Hayes' qualifications did not compare to those of Plaintiff.</u>

In contrast to Mr. Ponce's years of experience at the GS-15 level, Ms. Hayes had only

recently been selected to serve at the GS-15 level.  At the time of the application, Ms. Hayes had

been a GS-15 for just over a year.  For five years prior to that time, Ms. Hayes had actually been

supervised by Mr. Ponce at the Department of Commerce.  Ex. 4 (Ponce Dep.) at 16-17.  While

4

at the Department of Commerce, she had no regular supervisory experience and no experience in advising senior level officials on policy matters. Ex. 2 (Hayes Dep.) at 36-39. At the time of the selection, Ms. Hayes was the GS-15 Chief of the Affirmative Action and Special Programs Office (AASPO) at the Library of Congress. Ex. 3 (Hayes Application) at 2. Her supervisor was Gilbert Sandate. *Id.* The Director of Workforce Diversity became vacant when Mr. Sandate retired. Ms. Hayes acted briefly in the position of Director of OWD following Mr. Sandate's retirement. Ex. 15 (ROI) at 29.

Only a year prior to the selection of the Director position, when Ms. Hayes applied for the GS-15 position at the Library in 2005, Mr. Ponce was solicited for a recommendation of Ms. Hayes by Mr. Sandate, who was the selecting official for that position. Ex. 4 (Ponce Dep.) at 21. Mr. Sandate later served as a panel member in the selection for the Director position at issue in this case, thus carried his knowledge of Ms. Hayes from the 2005 selection into the Director selection process. Mr. Ponce gave Ms. Hayes a generally positive recommendation but also warned Mr. Sandate that "[Ms. Hayes'] challenge would be her interpersonal skills because she had not worked for [Mr. Ponce] as a supervisor before." *Id.*

Although Ms. Hayes had listed Mr. Ponce as her recommending supervisor at the Department of Commerce for the GS-15 position in 2005, she conspicuously omitted him from her application when she applied for the Director position in 2006. Instead, she listed Suzan Aramaki as her "supervisor." Ex. 3 at 1. Mr. Sandate, who had interviewed Mr. Ponce as Ms. Hayes' former supervisor at the Department of Commerce, did not question why she had now named another supervisor. Ex. 8 at 121-23.

Ms. Hayes also seriously misrepresented her credentials in her 2006 application for the Director position.  In her application she stated that she was the "Deputy Division Chief and Minority Serving Institutions (MSIs) Program Manager.  Ex. 3 (Hayes App.) at 1.  But the title of Deputy Division Chief was not her official title or role but instead apparently something she gave herself as the number two person in the office.  Ex. 2 (Hayes Dep.) at 30-32;  *see also* Ex. 5 (Aramaki Affidavit) at ¶ 5.  Ms. Hayes also represented that she was responsible for managing senior EEO personnel at the Department of Commerce.  Ex. 4 (Hayes App.) at 1.  However, this was false as she stated that she "didn't manage, but [she] worked closely with another individual in the office."  Ex. 2 (Hayes Dep.) at 36; *see also* Ex. 5 (Aramaki Affidavit) at ¶ 4.  Ms. Hayes also represented that she had dealings with high level officials at the Department of Commerce, stating she was the "principal advisor to the Secretary and Deputy Secretary of Commerce."  Ex. 3 (Hayes App.) at 1-2.  Again, Ms. Hayes's statement was misleading as she had actually only met with the Secretary's designee, the assistant secretary, and did not advise the Secretary or Deputy Secretary herself.  Ex. 2 (Hayes Dep.) at 38-39; *see also* Ex. 5 (Aramaki Affidavit) at ¶ 6.

Mr. Sandate and the selecting official must have known that Ms. Hayes had misrepresented her credentials in her 2006 application.  Mr. Sandate had reviewed Ms. Hayes' 2005 application and had interviewed her for the GS-15 job at the Library only a year earlier. Ex. 8 at 121-23.  He had also interviewed her first-line supervisor at the Department of Commerce, Jorge Ponce.  *Id.*  Yet, she did not list Mr. Ponce on her 2006 application.  General Scott must have known that Ms. Hayes had misrepresented herself on her application because he himself exaggerated her qualifications.  Ex. 12 ("justification" statement).  He also misrepresented what

her supervisor had said when he "checked" her references.  Ex. 5 (Aramaki Aff.).  He also failed

to sufficiently inquire into Ms. Hayes' duties at the Department of Commerce or perform the

reference check on her with the due diligence that would have uncovered these

misrepresentations.  So, too, as further explained below, General Scott misrepresented the

information he did gather from Ms. Hayes' former supervisor.

      C.     <u>The Application and Selection Process</u>

In June 2006, the Library of Congress posted a vacancy announcement for the position of

Director of Workforce Diversity, a Senior Level position. Ex. 6. The Library of Congress had

recently altered its selection process for vacant positions due to a court order in a Title VII

matter.  Ex. 7 (Scott Dep.) at 21-22.  The management officials involved in the selection for the

Director position were not as familiar with this process as this selection procedure had been used

only a few times prior to this selection.  Ex. 7 at 21-22.

Plaintiff submitted his application for the position on June 5, 2006. Ex. 1 at 1.  Included

in that application was a detailed work history, educational background, and additional

information concerning Plaintiff's training and awards received over the years.  *See id.*  In

addition, applicants were required to respond to a number of "Knowledge, Skills and Abilities"

("KSA") competencies by self-ranking and providing a narrative in support of that self-ranking.

Plaintiff provided a significant amount of detail with respect to each KSA and gave specific

examples related to each category.  *See id.* These KSAs corresponded with the categories the

Interview Panel would later base their scoring on for each applicant.

General Donald Scott, then Deputy Librarian of Congress, was the selecting official for

the vacancy.  He convened a job analysis panel ( "JA panel").  The JA panel reviewed the

position description and KSAs, and determined the weight and relative importance of the KSAs. General Scott included himself on the JA Panel and was also required to include two "subject matter experts," who were knowledgeable of the responsibilities and tasks of the Director for the Office of Workforce Diversity ("OWD") position. General Scott selected Deanna Marcum, a Senior Level Associate Librarian for Library Services, as she oversaw the largest organization within the library and thus required the most support from OWD. Ex. 7 (Scott Dep.) at 52. He also selected Gilbert Sandate, the incumbent in the position of Director of the OWD, even though Sandate had already retired at the time of the selection. General Scott testified that he had a very high professional regard for Mr. Sandate as the former Director of the OWD. *See* Ex. 7 (Scott Dep.) at 51-52. General Scott stated that "any recommendation that [Mr. Sandate] would make [with respect to the OWD], [General Scott] was certainly going to go along with it." *Id*.

After the vacancy announcement closed at the end of June 2006, the applications were screened and a list of 43 applicants was forwarded by Human Resources Services to General Scott. General Scott forwarded that list to the Interview panel ("IP") which again consisted of himself, Mr. Sandate, and Ms. Marcum. The IP determined that 16 of those 43 applicants would be interviewed, among them Mr. Ponce and Deborah Hayes.

During the interview process, the panelists took turns asking scripted questions that were based on the KSAs. Some questions were asked that were not on the standardized list of questions. Ex. 8 (Sandate Dep.) at 86-87. Each panel member had an Interview Guide for each candidate. Exs. 9 and 10. That Guide contained the KSAs and a ranking sheet for each candidate's response to the question or questions related to that particular KSA. The possible

8

scores ranged from "O" to "4," with "4" being the highest.  The IP members took notes on the

Interview Guides and scored a candidate immediately after the interview with that candidate.

Ex. 8 (Sandate Dep.) at 88.  Occasionally, the IP members would briefly discuss the candidate

following the interview.  *Id.* at 88, 110.

      Following Mr. Ponce's interview, Ms. Marcum commented that Mr. Ponce had provided

one of the best discussions about EEOC Management Directive 715 and also about Affirmative

Action of all the interviewees.  Ex. 8 (Sandate Dep.) at 88-89.  There was also discussion by the

panelists regarding Mr. Ponce's role in "advocacy" groups.  *Id.*  Mr. Sandate remarked that Mr.

Ponce was a very good candidate and had done well in the interview.  *Id.* at 91.

      At the conclusion of the interview process, the panel members turned their scores into

Jewel Baldwin of Human Resources Services to tally and compile the final score sheets.  *Id.* at

113.  The panel members then met again with Ms. Baldwin to each sign the score sheets for each

candidate when the sheets were finalized.  *Id.*  On the final score sheets, Ms. Hayes had the

highest score, followed closely by Mr. Ponce.  Exs. 9 and 10 (Final score sheets).

      There were some anomalies in the scoring process.  For example, Mr. Ponce's overall

score was tallied incorrectly– it should have been at least two points higher based on a

calculation error.  Ex. 15 (ROI) at 26.  The scoring was not particularly significant in terms of

comparing the candidates to one another.  For example, Mr. Sandate gave both Mr. Ponce and

Ms. Hayes a score of "3" with respect to the KSA "Ability to Lead and Manage a Workforce,"

when he viewed them independently.  Ex. 9.  Yet, when directly comparing their resumes, Mr.

Sandate identified Mr. Ponce as having significantly more supervisory experience than Ms.

Hayes, despite having ranked them the same on his score sheet.  Ex. 8 (Sandate Dep.) at 101.

9

Thus, at least in terms of the two highest scoring candidates, the scores did not provide an apt means of comparison for the selecting official.

As the selecting official, General Scott made the final selection.  About a week after the interview process was complete, General Scott made a phone call to Mr. Sandate.  *Id.* at 114.  He asked Mr. Sandate's opinion of a few of the candidates.  *Id.*  Mr. Sandate offered his views on who the stronger candidates were or as Mr. Sandate put it: "candidates who [he] felt were stellar."  *Id.*  Among those few candidates he mentioned as "stellar" was Mr. Ponce.  *Id.*  Mr. Sandate did not mention Ms. Hayes in his discussion of the most superior candidates.  *Id.*

At the end of the conversation, General Scott asked Mr. Sandate what he thought of Ms. Hayes because General Scott had "decided to go with Deborah Hayes."  Ex. 8 (Sandate Dep.) at 115-16.  Mr. Sandate replied that "she was a fine candidate.  She had a solid background of experience, but that [he] didn't think she had the same level of – senior level experience as some of the other candidates."  *Id.*

General Scott testified that if Mr. Sandate had made any recommendations about the job that were "specific to running [the OWD] and subject matter kind of expertise, yes, [he] certainly would have listened to [Mr. Sandate]."  Ex. 7 (Scott Dep.) at 89.  General Scott further stated that he would have probably agreed with any recommendation made by Mr. Sandate for the position.  *Id.* at 89-90.  Yet, in direct contrast to his testimony, General Scott selected Ms. Hayes in spite of Mr. Sandate's statement that others were more qualified, including Mr. Ponce.  So, too, General Scott erroneously stated that Mr. Sandate had recommended Ms. Hayes the most highly for the position, in contrast to Mr. Sandate's testimony that he had done nothing of the sort.  *See* Ex. 8 (Sandate Dep.) at 114-16.

Having already chosen Ms. Hayes for the position, General Scott then conducted a cursory reference check. Ex. 7 (Scott Dep.) at 108. He called Suzan Aramaki, the individual Ms. Hayes falsely identified as her supervisor. *See* Ex. 11. General Scott's notes of the call indicated that Ms. Aramaki stated that "Ms. Hayes was most adaptable and flexible, a jack of all trades, had a thirst for learning, . . ." Ex. 11 (Scott Notes). General Scott stated that was Ms. Aramaki's phrasing, rather than his own. Ex. 7 (Scott Dep.) at 110-11. Ms. Aramaki recalled the conversation very differently and noted that "the terminology ascribed to [her] appear to be words and phrases that [she did] not typically use." Ex. 5 (Aramaki Affidavit) at ¶ 8. Ms. Aramaki stated that she would not have used the term "jack-of-all-trades," nor did she indicate that Ms. Hayes was "patient" or "a cut above her peers" among other things listed on General Scott's notes that he testified to be her exact words. *Id.*

General Scott was provided a list of questions to ask references. Ex. 7 (Scott Dep.) at 109. He only asked Ms. Aramaki some of those questions. *Id.* Additionally, General Scott stated that he conducted a reference check on Ms. Hayes with Mr. Sandate. *Id.* at 113-17. But Mr. Sandate only received one call from General Scott, which was about all of the candidates, and was not a reference check for Ms. Hayes. Ex. 8 (Sandate Dep.) at 114; Ex. 7 (Scott Dep.) at 114. Further, General Scott did not ask any questions from the list, but only asked Mr. Sandate what he thought about Ms. Hayes generally. Ex. 8 (Sandate Dep.) at 114-16. General Scott admitted that he did not call the third person listed as Ms. Hayes' reference at all. Ex. 7 (Scott Dep.) at 117. General Scott's failure to contact the third reference, coupled with his mischaracterizations of what Sandate and Aramaki said, showed that he had no interest in hearing what the references really had to say.

11

When deposed, General Scott stated that he did not select Mr. Ponce for the position because he thought Mr. Ponce was an "activist." Ex. 7 at 76-78, 83-85.  General Scott stated that Plaintiff was involved with groups that were civil-rights oriented, and that General Scott was concerned that Plaintiff was an "activist" that would take sides against the Library in EEO matters.  The fact that Mr. Ponce talked about his "involvement with civil rights issues and his involvement with other organizations that . . . were civil rights oriented" caught General Scott's attention.  Ex. 7 (Scott Dep.) at 75-77.  General Scott was concerned that Mr. Ponce would be an activist in the position and take sides "with organizations within the Library to advocate that the Library was discriminating."  Ex. 7 (Scott Dep.) at 84-85.

General Scott's concerns about Mr. Ponce's "activism" was thinly-veiled animus about the "type" of Hispanic that he believed Mr. Ponce to be.  Although Mr. Ponce did not tell General Scott that he was Cuban American, General Scott stated that he knew Mr. Ponce was Cuban American "from the interview," and even wrote it on the Interview Guide.  Ex. 7 (Scott Dep.) at 79.  But Mr. Ponce did not tell Mr. Scott he was Cuban American, much less mention his national origin during the interview. Ex. 4 (Ponce Dep.) at 54.

General Scott had previously treated an Hispanic male disparately in favor of Ms. Hayes. When Mr. Sandate retired and the Director position became vacant, General Scott had originally stated that the two GS-15s in the office would rotate as acting Director.  Ex. 19 (Grijalva Aff). He first placed the other GS-15 in the office, Ricardo Grijalva, an Hispanic male who was also a candidate for the permanent Director position, in the acting position not to exceed 48 days.  Ex. 15 (ROI) at 29.  However, prematurely, General Scott approved the termination of the appointment, and immediately thereafter placed Ms. Hayes in the acting position for a period of

12

45 days. He then extended her detail until the point when she was promoted to the permanent position. *Id.* Ms. Hayes interviewed for the position while she was acting in the position. Ex. 10. Thus,, to the detriment of Mr. Grijalva, General Scott enabled Ms. Hayes to act in the position for almost a month prior to the interview and to continue in acting in the position throughout the time that the interviews for the permanent position of Director took place and the selection was made.

General Scott has been inconsistent, at best, in his justification for selecting Ms. Hayes. The investigator concluded that the evidence suggests that "General Scott may have inappropriately tipped the scales towards Ms. Hayes' selection based on discriminatory motivation." Ex. 15 (ROI) at 27. In an undated "Justification," General Scott stated:

> [a]ll three panel members evaluated Ms. Hayes as being the most knowledgeable in the laws, policies and procedures in the civil rights arena and assessed her as having the greatest ability to interact with others in the affirmative action, alternative dispute resolution and equal employment opportunity areas.

Ex. 12 (Justification). This statement is completely false. In fact, for example, Ms. Marcum rated Mr. Ponce higher than Ms. Hayes in the knowledge of EEO laws, regulations, policies and procedures. *Compare* Ex. 9 *to* Ex. 10; *see also* Ex. 15 (ROI) at 27. So, too, the panelists scored the candidates equally in the affirmative action, ADR and EEO arenas. *Id.* at 28.

Additionally, Mr. Sandate stated that General Scott gave him completely different reasons for why he was selecting Ms. Hayes: reasons which are unstated in the "justification." Ex. 12. General Scott told Mr. Sandate that Ms. Hayes was selected because she was familiar with the Library, knew all of the key players, and would bring consistency to the program. Ex. 15 at 31 (citing ROI Ex. 8, Response No. 42). However, General Scott later stated that the fact Ms. Hayes was already employed by the Library did not have any impact on his decision to

select her for the position.  Ex. 13 (Scott Interrogatory Answers) at No. 54.  In his deposition,

General Scott changed his reasoning again, and stated that he felt Ms. Hayes was a "better fit"

than Mr. Ponce because she had worked under Mr. Sandate.  Ex. 7 (Scott Dep.) at 108-09.

General Scott could not keep his own reasoning for selecting Ms. Hayes straight.   Lastly,

General Scott justified Ms. Hayes' selection by saying she was a "better fit," but could not

provide any specific characteristics, skills, or experience that made her the "better fit."  Ex. 7

(Scott Dep.) at 108.

     D.     <u>The Library had a documented underrepresentation of Hispanic Males at the
senior level.</u>

In 2006, at the time the selection was made, a workforce analysis had been conducted by

the Library of Congress.  Ex. 14.  The study concluded that there was a significant

underrepresentation of Hispanics within the Library's workforce.   *Id.*; Ex. 8 (Sandate Dep.) at

35-39; Ex. 15 (ROI) at 4.  In addition, there was a significant underrepresentation of Hispanic

males at the senior level at the Library.  Ex. 15 (ROI) at 4.  In fact, the Affirmative Action

Recruitment Plan for the position of Director of the OWD reflected this underrepresentation in

the job series (260) posted for this job.  Ex. 14.

The management officials involved in the selection for the Director position knew of the

underrepresentation of Hispanic males at the senior level.  Indeed, Ms. Marcum even raised this

underrepresentation as an issue with General Scott and Mr. Sandate at the beginning of the

interview process.  Ex. 16 (Marcum Dep.) at 18-19.  She asked whether they should be

concerned about filling the position with an Hispanic male since it was being vacated by an

Hispanic male and there was an underrepresentation of Hispanic males at the senior level.  *Id.*

However, General Scott disregarded this issue and even stated that the underrepresentation of Hispanics at the senior level was not a primary concern of his.  Ex. 7 (Scott Dep.) at 138-39.

      E.      Ms. Hayes was a poor performer in the position of Director of OWD.

After being selected for the position of Director of the Office of Workforce Diversity, Ms. Hayes only remained in the position a short time before she was proposed for removal from the senior level by her supervisor, Joanne Jenkins, due to her performance issues.  Ex. 2 (Hayes Dep.) at 52-54.  Ms. Jenkins raised the performance issues almost immediately and then later suggested that Ms. Hayes step out of her position rather than be removed.  *Id.*  Ms. Jenkins was concerned about Ms. Hayes' ability to manage the office as there were some "significant personnel issues."  *Id.* at 52.  Indeed, on Ms. Jenkins' stated intention to remove Ms. Hayes, Ms. Hayes left the Library of Congress for a lower-graded position at the United States Mint.  *Id.* at 7-8; 54.

      F.      An Internal Investigation found that Mr. Ponce was discriminated against on the basis of race, sex, national origin and age.

An internal investigation was conducted when Mr. Ponce filed a formal complaint of discrimination against the Library of Congress.  *See* Ex. 15 (ROI).  The investigation was performed by Frank Mack, an attorney with the Government Accountability Office's (GAO) Personnel Appeals Board Office of the General Counsel (PAB/OGC).  *Id* at 1-2.  After a thorough investigation into the selection, Mr. Mack found that the Library's stated reason for the selection of Ms. Hayes "was a pretext for unlawful discrimination based on race, sex, age and national origin."  *Id.* at 32.  PAB/OGC recommended that the Library make such a finding and sustain Mr. Ponce's complaint, which the Library refused to do.  *Id.*  The investigation also found that General Scott had inappropriately tilted the scales in favor of Ms. Hayes when he

continually mischaracterized the IP's scoring of Ms. Hayes, and misrepresented Ms. Aramaki's and Mr. Sandate's statements regarding her experience and skills.  Ex. 15 (ROI) at 27-28.

## II.      LEGAL STANDARD

Summary judgment is appropriate only where the trier of fact determines that, given applicable substantive law, no genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255 (1986).  An issue of fact is "genuine" if the evidence is such that a reasonable fact-finder could find in favor of the non-moving party.  *See George v. Leavitt,* 407 F.3d 405, 410 (D.C. Cir. 2005); *see also Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 105 (1st Cir. 1988).  In ruling on motions for summary judgment, the court's function is not to weigh the evidence and render a determination as to the truth of the matter, but only to determine whether there exists a genuine factual dispute. *See Anderson*, 477 U.S. at 248-49.  Credibility determinations are not appropriate matters for summary judgment. *See, e.g., id.*

A party seeking summary judgment faces a heavy burden. Since such motions seek to preclude the opposing party from presenting evidence to the jury, the law requires that all material facts and reasonable inferences therefrom must be viewed in the light most favorable to the nonmoving party:

> Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the district court is obliged to view the evidence in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 157 (1970); *Popham, Haik, Schnobrich, Kaufman & Doty, Ltd. v. Newcomb Securities Co.*, 751 F.2d 1262, 1263 (D.C. Cir. 1985) ("Any doubt is to be resolved against the moving party.").

*Washington Post Co. v. Dep't of Health and Human Services*, 865 F.2d 320, 325 (D.C. Cir. 1989). *See also Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1295 (D.C. Cir. 1998) (applying these principles in an employment discrimination case).  Defendant's motion cannot survive this rigorous standard.

Courts must be especially cautious of summary judgment in Title VII claims because of the difficulty in establishing discriminatory intent and disparate treatment. *See, e.g.*, *Hastie v. Henderson*, 121 F. Supp.2d 72, 77 (D.D.C. 2000).  Summary judgment is inappropriate when a reasonable fact finder could infer discrimination based on the evidence. *Id. See also Holcomb v. Powell*, 433 F.3d 889, 899 (D.C. Cir. 2006) (finding that a plaintiff can overcome a motion for summary judgment by presenting evidence that would permit an inference of discrimination). The plaintiff can show discrimination "either directly by persuading the fact finder that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *George,* 407 F.3d at 413 (*citing Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

In proving discrimination, the burden of establishing a prima facie case is not an onerous one. *See Burdine,* 450 U.S. at 253.  Once the plaintiff sets forth a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. *See id.*  If the defendant carries this burden, the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  *See id; see also Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 144 (2000).  Proof that the defendant's explanation lacks credence represents one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite

persuasive. *See Burdine*, 450 U.S. at 235; *see also Czekalsi v. Peters*, 475 F.3d 360, 366 (D.C. Cir. 2007) (*citing Reeves*, 530 U.S. at 147).

Once both parties have met these burdens earlier, the burden shifting schemes of *McDonnell Douglas* disappear. *See Reeves*, 530 U.S. at 142-44. "At that point, the relevant inquiry is whether there is sufficient evidence from which a reasonable fact finder could find in favor of the plaintiff, although 'the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Sanders v. Veneman*, 211 F. Supp.2d 10, 17 (D.D.C. 2002) (citations omitted).

The trier of fact may infer the ultimate fact of discrimination from the falsity of the employer's explanation. *Reeves*, 530 U.S. at 147-48. Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. *Id.*

## III.   ARGUMENT

This case is inappropriate for summary judgment. Defendant makes two arguments, both of which should be rejected by this Court. Defendant first argues that its proffered reason for selecting Ms. Hayes– that she did better in the interview– obviates any need for a trial. Putting aside the fact that Defendant attempts to justify its selection based on the most subjective aspect of the selection procedures, Defendant ignores the compelling evidence of Plaintiff's far superior qualifications for the job, the selecting official's lack of credibility, and the selectee's massive misrepresentations of her credentials, among other things. Together, these show that the Defendant's proffered explanation is not worthy of credence.

The Court should also reject Defendant's second argument that the Affirmative Action report, attesting to an under-representation of Hispanic males at the senior level at the Library, should not be considered by the Court. The Report is clearly relevant evidence, as it is undisputed that the selecting official discussed the report and the underrepresentation of Hispanics during the selection process. The significance of this discussion by the selecting official must be a matter for the jury to weigh.

A.      Plaintiff has undisputably established a prima facie case of discrimination.

Defendant has tacitly conceded that Plaintiff has established a prima facie case of discrimination. Certainly, it has made no argument to the contrary. Thus. for purposes of this motion, the Court must consider Plaintiff to have established a prima facie case of race, national origin and sex discrimination. The plaintiff carries the burden of proving a *prima facie* case of discrimination by the preponderance of the evidence. *See George,* 407 F.3d at 411 (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To establish a *prima facie* case of discrimination, the plaintiff must show that "(1) [she] is a member of a protected class; (2) [she] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002); *accord George,* 407 F.3d at 412. The Supreme Court has emphasized that the *McDonnell Douglas* model of the *prima facie* case is not intended to be "rigid, mechanized, or ritualistic" and that its requirements can vary depending upon the factual context. *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1150 (D.C. Cir. 2004), *citing Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (*quoting Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

Plaintiff is a member of a protected class as a Hispanic, Cuban-American male.  He applied for the position of the Director of Workforce Diversity at the Library of Congress and was found to be well-qualified. Ex. 8 (Sandate Dep.) at 114.  He suffered an adverse employment action when he was not selected for the position.  An inference of discrimination is raised by the fact that Deborah Hayes, a female of non-Hispanic descent, was selected for the position.  To establish a prima facie case, Plaintiff need not show that he is even as qualified as the successful applicant, only that he is qualified "relative to the entire pool from which applications are welcome." *Mitchell v. Baldrige*, 759 F.2d 80, 85 (D.C. Cir. 1985).  Plaintiff has proffered far more evidence than this minimal standard: he had proffered evidence that he had significantly more experience than the selectee and was far more qualified for the job.  These facts alone easily establish a prima facie case of discrimination; however, Plaintiff has alleged far more facts, as discussed below, that establish a very strong inference of discrimination.

B.      Plaintiff has established that Defendant's proffered legitimate reason is pretext for discrimination.

Once a plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to "produce evidence that the plaintiff was rejected ... for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254.  When a defendant fails to meet its burden of production, an inference of discrimination is appropriate. *See, e.g., Forman v. Small,* 271 F.3d 285, 301 (D.C. Cir. 2001) (reversing summary judgment where employer "failed to meet its burden of production to set forth a legitimate, non-retaliatory reason" for employment action).

Evidence that a defendant's proffered explanations for its non-selection of a plaintiff may be "unworthy of credence [is] probative [and] may be quite persuasive" proof of intentional

discrimination.  *Reeves*, 530 U.S. 133.  Indeed, "a plaintiff's prima facie case, combined with

sufficient evidence to find that the employer's asserted justification is false, may permit the trier

of fact to conclude that the employer unlawfully discriminated."  *Id.*

        1.     *Mr. Ponce is significantly better qualified for the position.*

      Defendant claims that it selected Ms. Hayes because she was the best-qualified candidate.

Contrary to Defendant's representation, the objective evidence shows that Plaintiff was

significantly better qualified for the job.  *See Washington v. Chao*, 577 F.Supp. 2d 27, 43-44

(D.D.C. 2008).  Defendant acknowledges that the selection of a significantly less-qualified

candidate can demonstrate pretext.  *See Gipson v. Wells Fargo, N.A.*, 460 F. Supp 2d 15, 26

(D.D.C. 2006) (finding that an objective difference in education and years of experience was

sufficient to support a finding that the plaintiff was significantly better qualified than the

selectee).

      In a non-selection case, pretext is demonstrated "if a factfinder can conclude that a

reasonable employer would have found the plaintiff to be *significantly better qualified* for the

job, but this employer did not." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir.

1998) (en banc) (emphasis added).  *See also Ash v. Tyson Foods*, 546 U.S. 454, 457 (2006)

("qualifications evidence may suffice, at least in some circumstances, to show pretext").  From

such a conclusion, the factfinder can infer that discrimination was the real reason for the

employers selection of the less qualified candidate.  *Id.*  While the employer certainly has a right

to decide among qualified candidates, without the factfinder reexamining an already difficult

decision, those decisions that rely heavily on a subjective explanation, such as a evaluation of

"interpersonal skills," warrant a higher level of scrutiny.  *Gipson*, 460 F. Supp.2d at 25 (denying

summary judgment as the disparity in the candidates qualifications combined with the highly subjective explanation put forth by the employer were sufficient to create a material dispute as to whether the employer's proffer was pretextual). The disparity in qualifications is not required to be "overwhelming" to survive summary judgment, but only significant enough to support a jury finding that the Plaintiff was the significantly better qualified for the position. *Id.*

There is simply no dispute here that Mr. Ponce was far more qualified for the job. Mr. Ponce had more relevant education than Ms. Hayes. He had a Masters in Library Sciences whereas she had no advanced degree in Library Sciences. *Compare* Ex. 1 *to* Ex. 3. Also, Mr. Ponce had more tenure and experience as a GS-15 than Ms. Hayes. He had been a GS-15 for five more years than Ms. Hayes. Mr. Ponce had extensive supervisory experience and high-level management responsibilities for over six years at the time he applied for the job. Ex. 1 (Ponce App.) at 1. In contrast, Ms. Hayes had far less experience. She had only been a GS-15 for a year and only had one year of supervisory experience at the GS-15 level. Ex. 3 (Hayes App.) at 2. Her short tenure at the Library of Congress at the GS-15 level could not possibly overshadow Plaintiff's many more years working at that grade.

Prior to working at the Library of Congress, Ms. Hayes had no prior regular supervisory experience. Ex. 2 (Hayes Dep.) at 36. When asked: "[d]id you have any supervisory responsibility [at the Department of Commerce]," Ms. Hayes replied "[n]o." *Id.* She also misrepresented her prior experience at the Department of Commerce, falsely claiming that she was the principal advisor to the Secretary and Deputy Secretary, and that she managed senior EEO personnel. Ex. 3 (Hayes App.) at 1. In contrast, Mr. Ponce regularly communicated with high-level officials and supervised five EEO managers. Most strikingly, Mr. Ponce had been

Ms. Hayes's supervisor for five years at the job she held just prior to coming to the Library of

Congress, and was thus obviously more qualified than her.  So, too, Ms. Hayes showed she was

not actually qualified for the job during her first year in the position, when the Defendant's Chief

Operating Officer proposed to demote her from the senior level due to her performance

deficiencies.  Ex. 2 (Hayes Dep.) at 52-54.  Given that Ms. Hayes only had one year of

experience at the GS-15 level as opposed to Mr. Ponce's six years of experience at that level,

that Mr. Ponce had supervised her for five years, he had a Masters degree in Library Sciences

which she did not hold, and Ms. Hayes could not meet the performance requirements of the job,

a jury could well conclude that Mr. Ponce had significantly better qualifications for the job.

Indeed, Mr. Sandate recognized Plaintiff's superior qualifications and related his opinion to the

selecting official.  Ex. 8 (Sandate Dep.) at 114-17.

Thus, Defendant's only assertion to support its claim of superior qualifications is that Ms.

Hayes was selected because she had a "superior" interview to Mr. Ponce.  Reliance on this

overly subjective, unverifiable, putative criteria is the hallmark of pretext.  This further cautions

against summary disposition in this case.  *See Aka.*, 156 F.3d at 1298 (holding that while

employers may make subjective considerations, courts traditionally treat explanations that rely

heavily on subjective considerations with caution, and in cases where a jury could reasonably

find that the plaintiff was otherwise significantly better qualified than the successful applicant,

an employer's asserted strong reliance on subjective feelings about the candidates may mask

discrimination).  *See also Fischbach v. D.C. Department of Corrections*, 86 F.3d 1180, 1184

(D.C. Cir. 1996) (noting an employer's heavy use of "highly subjective" criteria, could support

an inference of discrimination) (*citing Perfetti v. First Nat. Bank of Chicago*,  950 F.2d 449, 457

(7th Cir. 1991) (discussing "the ease with which employers may use subjective factors to camouflage discrimination"); *Ash,* 546 U.S. at 458 (2006) (holding that qualifications evidence standing alone may establish pretext where the plaintiff's qualifications are "'clearly superior'" to those of the selected job applicant); *Carter v. George Wash. Univ.,* 387 F.3d 872 (D.C. Cir. 2004) (holding that the United States Court of Appeals for the District of Columbia Circuit reviews subjective considerations with caution, since employers can easily use such criteria to mask discrimination).

This is also not a case where there is evidence that Ms. Hayes was a high-flyer who suddenly shone once being promoted to the GS-15 level.  Rather, her reputation at the agency did not impress either Ms. Marcum or Mr. Sandate.  Ms. Marcum confessed to being "surprised" by Ms. Hayes at the interview, which suggests that she was not favorably impressed by her prior job performance at the agency.  Ex. 16 (Marcum Dep.) at 34.  So, too, Mr. Sandate, who supervised Ms. Hayes at the Library of Congress, conspicuously did not include her among those he believed to be most qualified for the position—even after all of the interviews.  Ex. 8 (Sandate Dep.) at 114-16.  Aside from General Scott's suspicious failure to rotate Ms. Hayes out of the acting director position, there was simply no evidence presented that her job performance at the agency, prior to the selection process, made her stand out as a uniquely qualified candidate.

## 2. *General Scott is not a credible witness.*

Revealingly, Defendant does not contend that in actuality Ms. Hayes was more qualified, but rather that General Scott "honestly believed" her to be more deserving of the position.  Def. Memo. at 17.  But General Scott's "honest" belief is a matter of his credibility and thus must be

for the jury to weigh. In attacking a "qualifications-based" explanation, the plaintiff is not limited to mere comparison of his qualifications to the selectee's qualifications. *Aka,* 156 F.3d at 1295. The plaintiff may expose other flaws in the defendant's explanation such as contradictory accounts of the employer's decision that tend to show the explanation was fabricated or that the employer's explanation misstates the selectee's qualifications. *Id.* Further, a "suspicion of mendacity" is enough to support a finding of pretext and discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511(1993).

There are ample facts to challenge General Scott's "honest" belief and overall credibility. First, General Scott showed his animus toward Hispanics and his premeditated plan to select Ms. Hayes when he placed Ms. Hayes in the acting Director position and, despite his earlier promises, did not rotate that acting position properly to the detriment of another Hispanic applicant. Ex. 15 (ROI) at 29. General Scott had no explanation during the administrative investigation for failing to properly rotate the in-house candidates and removing Mr. Grijalva prematurely to place Ms. Hayes in the position and then prolonging her tenure in the acting position. *Id.* at 29-30.

Further compromising General Scott's credibility is the weight that General Scott said that he placed in Mr. Sandate's recommendation. Ex. 7 at 89. But Mr. Sandate made no such recommendation. Ex. 8 at 116. Mr. Sandate did not include Ms. Hayes in his list of the superlative candidates in his conversation with General Scott. Ex. 8 at 114-16. Indeed, according to Mr. Sandate, after he recommended the most highly qualified applicants, which did not include Ms. Hayes, General Scott said he had made up his mind to go with Ms. Hayes. *Id.* at 115-16. Mr. Sandate thought this was peculiar as he thought she was not as qualified as the

other candidates, including Plaintiff. *Id.* at 118. He told General Scott that he thought that Ms. Hayes did not have the same breadth of experience as the other candidates. *Id.* at 116. General Scott repeatedly said he would do whatever Mr. Sandate recommended. Ex. 7 at 89-90. But it is clear from the evidence that he did not actually follow Sandate's advice.

Another fact weighing against General Scott's credibility is that his "Justification" for selecting Ms. Hayes was wholly incorrect. This "Justification" was contrary to all other accounts of his selection. He stated that Ms. Hayes was viewed as the most knowledgeable on EEO polices, laws and regulations by the entire panel, but Ms. Marcum scored Mr. Ponce higher on that KSA. Further, General Scott later mentioned that he selected Ms. Hayes because she had worked under Mr. Sandate and knew the key players at the Library. Ex. 15 (ROI) at 31; Ex. 13 (ROI Ex. 8, Response 42). However, this is not mentioned in his "Justification" and it is also contrary to his Interrogatory Response where he denied that Ms. Hayes' prior employment with the Library of Congress played any role in her selection. Ex. 15 at 31. General Scott's inconsistency with respect to his reasons for selecting Ms. Hayes raises serious doubt as to his credibility as a witness.

In addition, General Scott's credibility is compromised by his false statement that he had never been named as a responsible management official in a discrimination case while at the Library. See Ex. 7 (Scott Dep.) at 132 . A female employee of the Library had filed a discrimination complaint naming General Scott as the person who had discriminated against her. Ex. 17 (EEO complaint). Mr. Grijalva, who was responsible for reviewing EEO complaints, stated that General Scott knew of the complaint because he had provided an affidavit in response to the EEO complaint. Ex. 18 (Grijalva declaration).

26

Last, a jury could draw an inference that General Scott is not credible because he failed to cooperate in the administrative investigation.  *See* Ex. 15 at 30-31.  The investigator had requested to meet with General Scott for an interview, but the Library refused to make him available although it was required to do so.  *Id.* at 30.  The investigator drew an adverse inference due to the lack of cooperation by General Scott, Ex. 15 at 32, and it would be reasonable for a jury to draw the same conclusion.

      3.     *Ms. Hayes' poor performance is evidence that she was not the best-qualified candidate for the position.*

Certainly, Ms. Hayes' dismal performance in the job cannot support a conclusion that Defendant selected the best-qualified candidate.  Indeed, once General Scott was no longer in a position of authority, Ms. Hayes flamed out quickly under the watchful eye of the new Chief Operating Officer, and was forced out of the job in about a year for her performance deficiencies.  Ex. 2 (Hayes Dep.) at 52-54.  After General Scott retired soon after Ms. Hayes' selection, Defendant's Chief Operating Officer moved to demote Ms. Hayes from the senior level after less than a year.  Ms. Hayes quickly retreated; in fact she probably knew the writing was on the wall even before she applied for the senior level position.  She applied for a GS-14/15 non-supervisory position under Mr. Ponce's supervision at the Department of Commerce just a couple of months after her selection to the GS-15 position at the Library of Congress.  Ex. 2 (Hayes Dep.) at 45.  She eventually took a demotion to the GS-15 level when she left the job to go to another federal agency.  Ex. 2 (Hayes Dep.) at 7-8.

As stated by the Sixth Circuit, "Of course, proving that an employer refused to hire or promote because of a person's race or sex is difficult. . . . [I]t is incumbent on a sensitive decisionmaker to analyze all of the surrounding facts and circumstances to see if discriminatory

intent can be reasonably inferred."   *Grano v. Department of Development*, 637 F.2d 1073, 1081

n. 7 (6th Cir. 1980).  That includes the selectee's later performance. *See Eldred v. Consolidated*

*Freightways*, 898 F.Supp. 928, 936 (D. Mass. 1995) (considering evidence that selectee was a

poor performer long after selection was made).  And, as stated by the Fourth Circuit, "post-

selection performance failures are relevant to a pretext inquiry when the selectee exhibited

similar performance failures during the decision process and where the decisionmaker was aware

of these failures." *Luh v. J. M. Huber Corp.*, 211 Fed. Appx. 143, 149 (4th Cir. Md. 2006).

Here, Mr. Sandate, one of the panelists, was aware of Ms. Hayes' limitations in 2005 because

Plaintiff had shared them with Mr. Sandate when Ms. Hayes was applying for the GS-15 position

at the Library of Congress.  Ex. 4 at 21.  Mr. Sandate testified that he shared his concerns

regarding Ms. Hayes' limited experience with General Scott during the selection process. Ex. 8

at 116-118.

Defendant also skates around the fact that Ms. Hayes materially misrepresented her

credentials in her application for the position.  Her exaggerations and misrepresentations also

support a finding that Mr. Ponce was objectively more qualified for the position. Ms. Hayes lied

about her credentials.  As the D.C. Circuit held in *Aka*, "[e]vents have causes; if the only

explanations set forth in the record have been rebutted, the jury is permitted to search for others,

and may in appropriate circumstances draw an inference of discrimination."  *Aka*, 156 F.3d at

1292.

Contrary to Defendant's assertion that there is no evidence that the decision makers knew

of Ms. Hayes' misrepresentations, there is certainly factual predicate for a jury to draw an

inference that the selecting officials knew of the misrepresentations.  As stated above, Mr.

Sandate had just interviewed and selected her for the GS-15 job only a year earlier, and must therefore have known that she had listed two different supervisors in her two applications.  Ex. 4 at 21, Ex. 8 at 122, 126.  During the administrative investigation, Mr. Sandate refused to answer questions about his earlier vetting of Ms. Hayes, which could lead a jury to infer that his lack of cooperation was due to the fact that he knew of her misrepresentations.  Ex. 15 at 24.

Moreover, General Scott himself misrepresented Hayes' scoring and the recommendation by Ms. Aramaki.  Thus, a reasonable jury could draw an inference that because General Scott himself lied about Ms. Hayes' qualifications, he also knew about Hayes' self-misrepresentations too.  Ex. 15 at 31.  Further, General Scott failed to make any inquires regarding her duties at the Department of Commerce.  Ex. 15 at 23-24.  General Scott had the opportunity and the responsibility to ask Ms. Aramaki about Ms. Hayes' duties and responsibilities at the Department of Commerce but failed to do so.  General Scott's misrepresentation of the facts, his lack of attention to detail, and his failure to ask appropriate questions meant that her actual qualifications were irrelevant to him.

4.   *General Scott did not want an Hispanic "activist" in the position of Director of OWD.*

Capping off Plaintiff's pretext case is the fact that the selecting official revealed his true animus for his non-selection of Plaintiff– his "activist" Hispanic background.  General Scott was concerned about Mr. Ponce's "activist" background citing Mr. Ponce's involvement with civil rights groups such as "the NAACP and the Hispanic American [group]."  Ex. 7 (Scott Dep.) at 85-86.  This is not a case, as Defendant would have it, where the selecting official made a legitimate judgment call between two well-qualified candidates.  Rather, General Scott objected to Plaintiff's status as an "activist" Hispanic, as compared to the "non-activist" Hispanic

incumbent in the job, Mr. Sandate, and the "non-activist" African American female, Deborah Hayes.  In sum, General Scott did not want Mr. Ponce in the position due to his advocacy for the Hispanic community.  General Scott noted Mr. Ponce's national origin in his interview notes, but Mr. Ponce never indicated that he was Cuban American during his interview or at any other time to General Scott.  Ex. 7 (Scott Dep.) at 79; Ex. 4 (Ponce Dep.) at 54.  Also, General Scott quickly dismissed Ms. Marcum's concerns that they should consider selecting a Hispanic for the position before interviewing Mr. Ponce and before assessing Mr. Ponce's subsequent stellar performance at his interview. Ex. 7 at 138-39.

General Scott's animus toward Hispanic males was also clear in his prior disparate treatment of Ricardo Grijalva when he prematurely removed him from the acting director position in favor of Ms. Hayes.  In addition, General Scott showed his animus toward Hispanic males when he told Ricardo Grijalva that he had not selected him for the senior level vacancy because he "talked too fast."  Ex. 19.  A jury could well conclude that this comment was a stereotypical prejudice of Hispanics speaking too quickly.  General Scott's perception of Plaintiff as an "activist," if viewed in the light most favorable to Plaintiff, was an indictment of Plaintiff's status as a Cuban-American advocate for other Hispanics.

Employment actions based on stereotyped gendered or racial assumptions are strictly prohibited under Title VII.   In *Price Waterhouse v. Hopkins*, the Supreme Court held "stereotyped remarks can certainly be *evidence* that gender [or, in this case, race too] played a part."  490 U.S. 228, 251 (1989).  In *Price Waterhouse*, the Court found that it was inappropriate for the defendant to exclude Ms. Hopkins from partnership at the firm due to stereotyped prejudices about her divergence from "normal" feminine standards.  For example, the partners

viewed Ms. Hopkins as "too aggressive," and thought she would do better if she wore makeup. *Id.* at 251, 256. *See also Schroer v. Billington*, 577 F. Supp. 2d 293, 303 (D.D.C. 2008) (in finding sex discrimination against a transgendered applicant to Library of Congress, noting sex stereotyping violates Title VII). Here, General Scott applied the same type of prejudice to Mr. Ponce. He wanted a minority in the position who, nevertheless, would not be an "activist" minority who advocated on behalf of Hispanics.

>5.   *The Library's divergence from the Affirmative Action Plan is additional*
>      *evidence of pretext.*

The Library's affirmative action plan shows that there was an underrepresentation of Hispanic males at the senior levels and in the particular job series at the agency. *See* Ex. 14. Despite Defendant's half-hearted plea for the court to ignore these statistics, it is well-settled that statistics are appropriately considered in a claim of disparate treatment under Title VII. *See McDonnell Douglas Corp. v. Green*, 411 U.S. at 805 (statistics showing a general pattern of discrimination are probative on the question of whether the reasons given for a particular action are pretextual); *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 437-38 (6th Cir. 2002) (significant underrepresentation of a racial group in an employer's workforce, combined with independent circumstantial evidence, can support an inference of discrimination); *Jones v. Lee Way Motor Freight, Inc.*, 431 F.2d 245 (10th Cir. 1970) ("[s]tatistical evidence is, of course, relevant to a claim of disparate treatment and should be given proper effect by the courts").

It is also misleading to simply characterize Defendant's affirmative action plan as "statistical evidence." Affirmative action plans, such as the one in this case, show not only statistical underrepresentations of minorities, but that there is a pattern of exclusion of such

minorities from particular jobs.  *See Verdell v. Wilson*, 602 F. Supp. 1427, 1440 (E.D.N.Y. 1985).  This, too, is relevant to the pretext analysis.

The Court must consider not just the fact of the statistics themselves, but the way in which the panelists and the selecting official considered the statistics and then rejected Plaintiff in spite of them.  The evidence shows here that the panelists and the selecting official squarely considered Plaintiff's race and sex in the context of the affirmative action plan, and then rejected him in spite of the glaring underrepresentation of Hispanic males at the senior level.  The panelists and the selecting official knew of the underrepresentation of Hispanic males at the senior level, and admittedly considered this issue during the selection process for the position of the Director for Workforce Diversity.  Yet, General Scott brushed it aside.  Ex. 16 (Marcum Dep.) at 18-19.  Indeed, one of the panelists, Ms. Marcum, asked General Scott if they should consider an Hispanic applicant for the position.  *Id.*  However, General Scott was not concerned with placing an Hispanic in the position despite the severe underrepresentation of Hispanic males at the senior level and responded that they should just be concerned about finding the best fit for the job.  *Id.*

When viewed in the light most favorable to Plaintiff, a jury could conclude that the rejection of Plaintiff from the position despite the selecting official's direct knowledge of the underrepresentation of senior-level Hispanic males was further evidence of pretext. That is, Plaintiff's race and sex were discussed by the panel and the selecting official during the selection process in the context of the affirmative action plan.  Ex. 7 at 79; Ex. 14. Yet, despite their direct consideration of Plaintiff's race and sex, coupled with their acknowledgment that there was an underrepresentation of Hispanic males at the senior level they rejected Plaintiff, the superior

32

candidate. It would be reasonable for a jury to conclude, therefore, that the panelists and the selecting official considered Plaintiff's race and sex when scoring the candidates and determining final selections.

This is far from the only evidence that supports Plaintiff's claims of pretext. Grouped with the evidence of Plaintiff's superior qualifications and the lack of credibility of the selecting official, the managers' direct consideration of Plaintiff's race and sex during the selection process show that there was illegal discrimination when he was not selected for the job.

## CONCLUSION

There are far too many facts in dispute for this case to be dismissed before trial. Defendant rests its entire case on General Scott's "honest belief" that Ms. Hayes was better qualified. But whereas here there are so many reasons to question General Scott's credibility, it would be wholly inappropriate to take this case away from the jury. Resolving credibility disputes is exclusively the province of the jury. Defendant has hardly posited a justification to take that right away from Plaintiff. For the foregoing reasons and those contained throughout the entire record in this case, Defendant's motion for summary judgment must be denied.

Respectfully submitted,


_____/s/_____
Michael Kator (Bar No. 366936)
Cathy A. Harris, (Bar No. 467206)
KATOR, PARKS & WEISER, P.L.L.C.
1200 18th Street, N.W., Suite 1000
Washington, D.C. 20036
Phone: (202) 898-4800
Fax: (202) 289-1389

December 1, 2009                     Attorneys for Plaintiff