# EXHIBIT 15

**Report of Investigation and Recommendation**
**In the Matter of**

*Jorge E. Ponce v. Library of Congress,* **EEO No. 07-03**

## I   ALLEGATION

The allegation in this matter is that the Complainant, Jorge Ponce, was discriminated against on the basis of his race, (Hispanic), sex (male), national origin (Cuban) and age (52), when he was not selected for the position of Director of Workforce Diversity (SL-0206), Office of Workforce Diversity ("OWD"), Library of Congress.

## II   PROCEDURAL BACKGROUND

On October 2, 2006, Complainant filed an informal complaint of discrimination with the Library of Congress ("Library") alleging that it discriminated against him when it did not select him for the position of Director of Workforce Diversity, posted under Vacancy Announcement No. 060157. *See Allegation of Discriminated dated October 2, 2006.* (ROI Ex. 1.)[1] Because his complaint concerned the selection of the Library official responsible for processing discrimination complaints, the Library entered into an Interagency Agreement ("IA") with the Government Accountability Office ("GAO") under which GAO's Personnel Appeals Board Office of the General Counsel ("PAB/OG" would process the complaint, and setting forth the procedures to be followed. Complainant was initially counseled regarding his claims on October 27. *See EEO Counseling Report dated November 15, 2006.* (ROI Ex. 2.)[2] Because the matter was not successfully resolved within thirty days after the initial counseling, the PAB/OGC notified Complainant of the right to file a complaint within fifteen days of Complainant's receipt

---

[1] "ROI Ex. . . ." refers to the exhibits accompanying this Report of Investigation.

[2] All dates refer to 2006 unless explicitly identified otherwise.

of the notice of final counseling interview. *See letter from Sue S. Farley to Jorge Ponce dated November 15, 2006* (ROI Ex. 3).    Complainant received that notice on November 25, and on November 27, timely filed a formal complaint of discrimination. *See Complaint of Discrimination dated November 27, 2006.* (ROI Ex. 4). Upon receipt of the Complaint, the PAB/OGC issued Complainant a letter advising him that the following claim was accepted for investigation:

> Whether you were discriminated against based upon your race (Hispanic), sex (male), national origin (Cuban), and age (52) when you were not selected for the position of Director of Workforce Diversity (SL-0206), Library of Congress.

*See letter from Anne M. Wagner to Jorge Ponce dated December 11, 2006.* (ROI Ex. 5.)  The letter requested that Complainant contact the PAB/OGC within five days of receipt if he believed that it did not correctly identify the issues raised in the complaint. Complainant did not respond to that letter.   The PAB/OGC then conducted an investigation of the alleged discrimination.  Having completed its investigation of Mr. Jorge's Complaint, the PAB/OGC hereby issues its "Final Report."

In the meantime, on December 6, Mr. Mack sent an email to Jessie James, then-Assistant General Counsel at the Library, stating that it was his understanding that Donald L. Scott, the Selecting Official for the vacancy at issue, was retiring on December 19 and moving out of the D.C. area.  Mr. Mack requested that the Library schedule Mr. Scott for an interview with Mr. Mack prior to his retirement.  Mr. James responded that he would "get back" to Mr. Mack shortly. *See emails between Frank J. Mack and Jessie James, Jr. dated December 6, 2006.* (ROI Ex. 6).  Following several additional attempts by Mr. Mack to interview Mr. Scott, the Library formally notified the PAB/OGC by letter dated December 28 that Mr. Scott would "not be available for a personal interview, but will respond to interrogatories propounded to him" by

the PAB/OGC. This letter further advised that Ms. Deanna Marcum, who was also involved in the selection process, and was currently employed at the Library, was likewise unavailable for a personal interview but would respond to written interrogatories. *See letter from Jessie James, Jr. to Anne Wagner dated December 28, 2006.* (ROI Ex. 7).

Subsequently, the PAB/OGC propounded interrogatories for Mr. Scott, Ms. Marcum and Gilbert Sandate, the third individual involved in the selection process, who had also retired and moved from the DC area prior to the initiation of this investigation. In addition, the PAB/OGC interviewed numerous individuals, including Complainant, as part of the investigation, and where appropriate, obtained affidavits from those interviewed. The interrogatory responses and affidavits are appended to this Report. [3]

## III   FACTUAL BACKGROUND

### A.   Events Leading to the Posting of Vacancy Announcement 060157

In May, the position of Director of the Office of Workforce Diversity, SL-0260, became vacant upon the retirement of Gilbert Sandate, the-then incumbent of that position. *See Interrogatory Responses of Gilbert Sandate dated October 25, 2007.* (ROI Ex. 8). The procedures governing the filling of that vacancy are set forth in the June 10, 2005 edition of the Library of Congress Merit Selection Plan ("MSP.") *See Library of Congress Merit Selection Plan, June 10, 2005* (ROI Ex. 9); *Affidavit of Jewel Baldwin dated October 3, 2007* (ROI Ex. 10, Response No. 4). Under the MSP, the appropriate Library organizational entity, referred to in Library parlance as a "Service Unit," was to identify the vacancy and designate a Selecting

---

[3]  Four individuals had filed discrimination complaints regarding Ms. Hayes' selection. As each complaint arose from the same facts and circumstances, the PAB/OGC investigated those complaints together. For privacy reasons, the PAB/OGC redacted from documents appended to this Report personal information not relevant to this Complaint.

Official. The Selecting Official was responsible for ensuring the accuracy of the position description for the vacancy being filled by reviewing the existing position description and updating the position description, if needed. New or updated position descriptions were to be forwarded to the Library's Human Resources Services ("HRS") for classification approval. (ROI Ex. 9).

The Office of the Librarian, under which the Office of Workforce Diversity is subsumed, submitted to the HRS office a Vacancy Announcement Request ("VAR") for the vacated Director's position. The VAR identified Donald L. Scott, then the Deputy Librarian of Congress, as the Selecting Official. Attached to the request was an existing Position Description ("PD") numbered 12400 which described the duties and responsibilities of the position of Director of Workforce Diversity. Also attached to the VAR was an Affirmative Action Recruitment Plan which indicated that there was underrepresentation of Hispanic males and Asian/American Pacific Islanders in the SL-0260 series at the Library. *See Vacancy Announcement Request with Position Description 12400 and Affirmative Action Recruitment Plan.* (ROI Ex. 11).

Following the VAR, the Library convened a Job Analysis Panel ("JA Panel"). The JA Panel was to consist of the Selecting Official and at least two Subject Matter Experts ("SMEs"), i.e., "individuals who are performing, have performed, or are very knowledgeable of the responsibilities and tasks of the position being filled and who are at or are above the grade level of that position." (ROI Ex. 9, at 11). Mr. Scott, the Selecting Official, requested Deanna Marcum, a Senior Level Associate Librarian for Library Services, to serve as an SME on the JA panel because she oversaw the largest organization within the Library and was, therefore, a primary stakeholder in how the OWD functioned. He also asked Gilbert Sandate to serve as an

SME on the JA panel because Mr. Sandate was the former incumbent of the Director position. *See Interrogatory Responses of Donald L. Scott dated October 31, 2007.* (ROI Ex. 12, Response No. 3).

The duties of the JA Panel included the following: (1) review the position description and determine any minimum educational, licensing, certification and/or experience qualifications in accordance with the provisions of the MSP; (2) identify the competencies and Knowledge, Skills and Abilities (KSAs) necessary to perform the duties of the position, including identifying "critical" competencies/KSAs[4]; (3) develop validated rating instruments, i.e., applicant questionnaires and structured interview guides, and/or other rating tools, which measure levels of proficiency in the competencies/KSAs; and (4) ensure the content-validity of the selection process by appropriately documenting the job-relatedness of the competencies/KSAs and rating instruments used to fill the vacancy. (ROI Ex. 9, at 7-8.)

On May 25, Jewel Baldwin, the HR staffing specialist for the vacancy, convened the JA Panel (ROI Ex. 10) and provided its members with PD 12400, a draft Job Analysis Worksheet ("Worksheet")[5] and a draft Crediting Plan/Applicant Questionnaire.[6]  The Worksheet and Crediting Plan/Applicant Questionnaire, both of which contained draft KSAs, were automatically created by the Library's on-line application system know as AVUE. (ROI Ex. 10, Response No. 5). The JA Panel was to determine which of the draft KSAs were job related, important to

---

[4]  Critical competencies/KSAs are those identified by the job analysis panel as "critical" for an applicant to possess in order to be selected.  (ROI Ex. 9, at 8.)

[5] *See Director of Workforce Diversity and Accommodations SL-0260-00 Job Analysis Worksheet* (ROI Ex. 13).

[6] *See Crediting Plan Questionnaire* (ROI Ex. 14).

performing the duties of the position, and required of the candidates in order to be selected.  The JA Panel was then to assign a relative weight ranging from one to three for each identified KSA, based upon the relative importance of each KSA to each other.  In addition, the JA Panel was required to identify the linkage between the KSAs and the duties found in the PD.  The JA Panel was also to identify the KSA to be measured in the Crediting Plan/Applicant Questionnaire and/or a structured interview, and the critical KSAs to be measured in a review of the narrative portion of the application, referred to by the MSP as the "narrative/application review." (ROI Ex. 9).

The JA Panel was to document its analysis in the Worksheet, including: (i) its identification of all KSAs to be used in the selection process; (ii) whether the KSA was required of the candidate upon selection; (iii) the relative weight assigned to each KSA; (iv) the identification of the rating instrument used to measure each KSA, i.e., the  Crediting Plan/Applicant Questionnaire, structured interview, or both; (v) the critical KSAs to be used in the narrative/application review or the full structured interview; and (vi) the linkage between each KSA and the duties identified in the PD.  (*Id*).

At the meeting of the JA Panel, Mr. Sandate proposed modifying the "Introductory Statement," the "Organizational Setting, the "Difficulty of Typical Work Directed," and the "Other Conditions" sections of the draft PD.  *See email from Gilbert Sandate to Jewel Baldwin, Deanna Marcum, and Donald L. Scott dated May 26, 2006.* (ROI Ex. 15).  Mr. Scott, as the Selecting Official, approved the proposed Sandate changes because he believed those changes more accurately described the position's chain of command.  *See email from Linda Turner to Jewel Baldwin dated June 16, 2006* (ROI Ex. 16);  see also ROI Ex. 12, Response No. 22.  The revised draft PD was certified by the HRS.  (ROI Ex. 10, Response No. 6).

B.     The Application and Screening Process

On June 2, the HRS sent to the OPM USA Jobs website Vacancy Announcement ("VA") 060157 to be posted with an opening date of June 5, and a closing date of June 26. (ROI Ex. 10, Response No. 8). *See also Vacancy Announcement No. 06157.* ( ROI Ex. 17). The VA listed six KSAs and noted that "The knowledge, skills, and abilities (KSAs) that are marked with a double asterisk (**) in the vacancy announcement and the applicant questionnaire are considered the most critical for a position." Three KSAs were identified in the VA with a double asterisk. (ROI Ex. 17). These were the (1) Ability to Lead and Manage Workforce Diversity, Equal Employment Opportunity, Dispute Resolution and Accommodation Programs in a Federal Environment; (2) Ability to interact collaboratively with others; and (3) Knowledge of Federal Equal Employment Opportunity and Affirmative Action laws, regulations, policies, and procedures and diversity strategies,

Applicants submitted their application on-line using the AVUE system.[7]   The on-line application consisted of three parts in which applicants could enter information: Work History; Education Background, and KSAs/Competencies. The KSAs/Competencies section of the on-line application allowed applicants to self-rate themselves by selecting a radio button under each KSA which the applicant believed most accurately reflected the applicant's experience in each KSA. Although the VA listed six KSAs, for reasons not in the record, the KSAs/Competencies section of the application did not contain a data entry field for the KSA "Ability to Collaborate With Others" – a KSA which had been determined by the JA Panel to be a critical KSA. Applicants were also asked to voluntarily identify their Race, Sex, and National Origin

---

[7]   Additionally, applicants could upload a resume.

("RSNO"). *See Application of Jorge E. Ponce*, (ROI Ex. 18); *Application of Deborah Hayes*, (ROI Ex. 19).

Under the MSP, the Library employed multiple steps to screen candidates for selection. Applicants were initially screened for basic eligibility through the AVUE system evaluating objective eligibility criteria such as whether the applicant timely submitted an application. Based on their self rating for each KSA, applicants were scored by AVUE on their applicant questionnaire/crediting plan. A composite weighted score was automatically derived by AVUE from the self-rating for each KSA multiplied by the KSA's weight as determined by the JA Panel. A cutoff score for referral to an Interview Panel (IP) was to be established by the Library based on the automated scoring of the applicant questionnaire/crediting plan. The list of applicants eligible for referral to the IP was to be reviewed by HRS to determine the degree of diversity of the referral pool, based on a comparison of the referral pool with the under-representation data identified in the Affirmative Action Recruitment Plan. (ROI Ex. 9, at 17).

Upon the closing of the VA, Ms. Baldwin gathered the RSNO data and the AVUE-generated scores of the applicants and prepared an RSNO Report. The Report showed that one-hundred-and-five applicants applied for the position, of which ninety-seven self-identified their RSNO. Fifty-eight applicants (thirty-three females and twenty-five males) identified themselves as "Black or African-American" and eleven applicants (seven females and four males) identified themselves as Hispanic or Latino. Eighteen candidates scored 100 and twenty-five candidates scored 99. Ms. Baldwin determined that if the cut-off score for referral to the IP was set at 100, one Asian and one Hispanic male (the underrepresented groups) would be referred for interview, and that if the cut-off score were lowered to 99, an additional Asian and Hispanic male would be referred for interview. Ms. Baldwin sent Mr. Scott the RSNO report with an email asked Mr.

Scott to establish a cut-off score for referring candidates to the IP.  In a reply email to Ms. Baldwin of the same date, Mr. Scott wrote "The cut-off will be 99.  We can screen the group to get reduce [sic] the number to 20 or less?" *See emails between Jewel Baldwin and Donald L. Scott dated June 28, 2006 with Attached RSNO Report.* (ROI Ex. 20).[8]  On July 3, Ms. Baldwin sent Mr. Scott an Interview Referral List containing the names of the forty-three applicants who scored either 100 or 99.  (ROI Ex. 21).  Mr. Scott, in turn, forwarded the list to the IP, which consisted of himself, Ms. Marcum and Mr. Sandate.[9]

   The IP was responsible for (1) ensuring that the interview process was conducted according to interview training and guidelines; (2) determining prior to conducting interviews whether to verify experience on self-assessment applicant questionnaire/crediting plans by reviewing narratives/applications and/or conducting preliminary telephone interviews; (3) conducting and documenting the narrative/application review and/or preliminary telephone screen, if appropriate; and (4) conducting the structured interview, scoring interviewees using benchmark anchors, and documenting the interview process. The IP elected to conduct a review of the narratives/applications provided by the applicants.  Under this option, the IP was able to disqualify applicants whose narratives/applications demonstrate less than "Fully Acceptable" experience on one or more of the critical KSAs. (ROI Ex. 9, at 18).

---

[8]   Mr. Scott asserts that he wished to reduce the number of candidates referred to the IP from 43 (those scoring either 100 or 99) to 20 because of time considerations and because he believed that 20 candidates would provide a sufficiently diverse applicant pool. (ROI Ex. 12, Response No 23.

[9]   Mr. Scott appointed Ms. Marcum and Mr. Sandate to the IP for the same reasons he appointed them to the JA Panel. (ROI Ex. 12, Response No.3).

C.    The Interview and Selection Process

Under the MSP, the Library used structured interviews to identify best-qualified

candidates for final referral to the Selecting Official for selection.  The MSP contemplated that

during the structured interview, the IP would use standard procedures and ask all applicants the

same interview questions. (ROI Ex. 9, at 19).  To that end, Ms. Baldwin drafted a Structured

Interview Guide ("SIG") which included the KSAs, the "benchmark anchors" for each KSA,

(i.e., standards to determine the appropriate rating for the competency;)  and an overarching

question with sample probe questions for each KSA.  (ROI Ex. 10, Response No. 10.)    The

draft SIG was reviewed an approved by the JA Panel. *Id.*  Following the interview of each

applicant, IP members independently scored each applicant on each KSA using a five-point scale

(4 = Outstanding, 3 = Superior, 2 – Fully Acceptable, 1 = Less than Fully Acceptable, 0 = No

evidence of experience.)   The IP initially scored Complainant and Ms. Hayes as follows:

| KSA[10] | Scott JP/DH | Marcum JP/DH | Sandate JP/DH | Total JP/DH |
|---|---|---|---|---|
| 1. Prior Background and Experience | *3/3* | *3/2-3*[11] | *3/3* | *9/8-9* |
| 2. Knowledge of EEO etc** | *3/3* | *4/3* | *3/3* | *10/9* |
| 3 Ability to Lead and Manage . . . ** | *3/3* | *3/3* | *3/3* | *9/9* |

---

[10]   The title of some of the KSAs are truncated in the charts contained herein because of space considerations.  Those full KSA titles are: (2) Knowledge of Federal Equal Employment Opportunity and Affirmative Action Laws, Regulations, Policies, and Procedures and Diversity Strategies; (3) Ability to Lead and Manage Workforce Diversity, Equal Employment Opportunity, Dispute Resolution and Accommodations Programs in a Federal environment; (4) Ability to analyze organizational and operational problems and develop solutions to improve business performance; (7) Ability to interact collaboratively with others.  The KSA designated by the Library as critical are identified with **.

[11]   Ms. Marcum initially scored some of the KSAs as "a range" between two numbers. *See Interrogatory Responses of Deanna Marcum dated June 26, 2007.* (ROI Ex. 22).

| | | | | |
|---|---|---|---|---|
| 4  Ability to analyze problems | 3/4 | 3-4/4 | 3/3 | 9-10/11 |
| 5  Ability to lead and manage a workforce | 2/3 | 4/3 | 3/3 | 9/9 |
| 6 Ability to Communicate in writing | 2/3+ | 3/3 | 3/2 | 8/8 |
| 7  Ability to interact collaboratively** | 2/2 | 3/4 | 3/3 | 8/9 |
| 8 Ability to communicate orally | 3/4 | 3/3 | 3/3 | 9/10 |

*See Structured Interview Guides.* (ROI Ex. 23 -28 inclusive).

After completing their initial scoring, the IP met with Ms. Baldwin, who compiled the individual scores and facilitated a discussion of the ratings and justifications. (ROI Ex. 10, Response No. 14). Based on that discussion, each IP member assigned each applicant a final score. Each applicant's final interview score was mathematically computed based on a weighted average of the interviewers' scores, calculated by (1) adding the scores across panelists for each KSA; (2) multiplying each composite score by the KSA Weight to obtain a weighted score; (3) adding weighted scores across KSAs into a Grand Total; and (4) dividing the Grand Total by the sum of KSA weights multiplied by the number of panelists. (ROI Ex. 9, at 19-20).

The IP gave Complainant and Ms. Hayes the following final rating:

| KSA | Scott | Marcum | Sandate | Total |
|---|---|---|---|---|
| | JP/DH | JP/DH | JP/DH | JP/DH |
| 1.  Prior Background and Experience | 3/3 | 3/3 | 3/3 | 9/9 |
| 2.  Knowledge of EEO etc** | 3/3 | 4/3 | 3/3 | 10/9 |
| 3  Ability to Lead and Manage . . . ** | 3/3 | 3/3 | 3/3 | 9/9 |
| 4  Ability to analyze problems | 3/4 | 3/4 | 3/3 | 9/11 |
| 5  Ability to lead and manage a workforce | 3/3 | 4/3 | 3/3 | 10/9 |
| 6 Ability to Communicate in writing | 2/3 | 3/3 | 3/2 | 8/8 |
| 7  Ability to interact collaboratively** | 2/3 | 3/4 | 3/3 | 8/10 |
| 8 Ability to communicate orally | 3/4 | 3/3 | 3/3 | 9/10 |
| **FINAL SCORE** | | | JP/DH | 2.9/3.1 |

(ROI Ex. 29-30 inclusive).

D.   The Selection

On August 18, Ms. Baldwin sent Mr. Scott a final referral of the best qualified applicants from which to make his selection, including the name and final interview score of the applicants referred. (ROI Ex. 10, Response No. 16; ROI Ex. 31).  That list contained the names of sixteen applicants, including Complainant and Ms. Hayes, for consideration for selection, and indicates that Ms. Hayes received the highest IP score (3.1), while Mr. Ponce received the second-highest score (2.9).  *See Memorandum from Jewel Baldwin to Donald Scott with attached Final Referral List.* (ROI Ex. 31).  Under the MSP, the Selecting Official was to choose from among the final referral list by weighing such factors as organizational needs, reference information, writing/work samples, and applicants' ratings on the most "important experience areas for the position as identified in the job analysis," i.e., the critical KSAs.  (ROI Ex. 9, at 21).

References were required to be checked only for those applicants under consideration for final selection, using a reference check form as a guide. (ROI Ex. 9, at 21).  Mr. Scott personally conducted a reference check of Ms. Hayes with Susan Aramaki of the Department of Commerce, (ROI Ex. 12, Response No. 41), whom Ms. Hayes had listed on her application as her supervisor. (ROI Ex. 19).  In conducting that reference check, he drew from a list of fifteen possible questions. *See Reference Check Form* (ROI Ex. 32).  He took notes of the reference check, which showed that he asked eight of the fifteen possible questions, and which indicated that Ms. Aramaki gave Ms. Hayes a positive reference.  *See Scott Memorandum dated August 24, 2006, captioned "Reference Report of Deborah Hayes, Finalist, Directive [sic]: OWD.* (ROI Ex. 33). Mr. Scott selected Ms. Hayes for the position, and in an undated "Justification" supporting Ms. Hayes' selection he wrote:

Ms. Hayes brings a wide range of knowledge and experience in workforce diversity activities, including affirmative action, special programs, dispute resolution and equal employment opportunity, that will enable her to build on the progress made in creating a fair, diverse and open work environment. All three panel members evaluated Ms. Hayes as being the most knowledgeable in the laws, policies and procedures in the civil rights arena and assessed her as having the greatest ability to interact with others in the affirmative action, alternative dispute resolution and equal employment opportunity areas.

. . . Prior to coming to the Library, Ms. Hayes served as Senior EEO Manager for the Department of Commerce, where she was the principal advisor to the Deputy Secretary of Commerce, the Chief Financial Officer, and the Assistant and Deputy Assistant Secretary for Administration. . . Ms. Hayes' background and forward thinking on workforce diversity will play a critical role in the development and recruitment of staff who will help achieve the Library's goal for the 21st century."

(ROI Ex. 12, Response No. 48. *See also Undated Justification for selection of Ms. Hayes,* ROI Ex. 34).

The Office of the Librarian prepared a Personnel Action Recommendation ("PAR") for Ms. Hayes' selection,  (ROI Ex. 10, Response No. 6), and she was appointed to the position effective September 18. Upon her selection, the Library issued a Special Announcement noting her selection. *See Special Announcement, Office of the Librarian, Library of Congress September 18, 2006,* (ROI Ex. 35).

## IV    ANALYSIS

Where, as here, there is no direct evidence of race, sex, national origin, or age discrimination, a claim of such discrimination must be analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Jackson v. Gonzales*, 496 F.3d 703 (D.C.Cir. 2007). Under that framework, the Complainant must establish by a preponderance of the evidence a *prima facie* case of prohibited discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Barnette v. Chertoff*, 453 F.3d 513 (D.C.Cir. 2006)(*McDonnell Douglas* framework applies to age discrimination claims.) In a non-selection claim, a *prima facie* case is established by showing that the Complainant: (1) is a

member of a protected class; (2) applied for and was qualified for an available position; (3) was rejected despite his qualifications; and (4) either someone filled the position or the position remained vacant and the employer continued to seek applicants. *Jackson,* 496 F.3d at 707.

If Complainant establishes a *prima facie* case, the burden shifts to the employer to produce "evidence that the [Complainant] was rejected, or someone else was preferred, for a legitimate non-discriminatory reason." *Jackson,* 496 F.3d at 707 (internal citations omitted). This is a burden only of production, not persuasion; the agency need not show that it was actually motivated by the proffered reason. *Barnette,* 453 F.3d at 516 quoting *Texas Dep't of Community* Affairs, 450 U.S. at 248. Should the employer produce such evidence, the focus of the inquiry becomes whether there is sufficient evidence to demonstrate that the articulated reason is a pretext for actual discrimination. *Barnette,* 453 F.3d at 516.

Here, the Complainant establishes a *prima facie* case of discrimination because he is a member of a protected class, he applied for a position for which he was qualified, he was not selected despite his qualifications, and the agency filled the position. *See Clipper v. Billington,* 414 F.Supp.2d 16, 21 (D.D.C. 2006). The Library articulates as it non-discriminatory reason for selecting Ms. Hayes that her "skills and abilities were a better fit for the organization." (ROI Ex. 12, Response No. 51). Because the agency articulated a non-discriminatory reason for its selection decision,[12] the inquiry then shifts to whether there is a preponderance of evidence that the articulated reason was a pretext for actual discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000); *Barnette,* 453 F.3d at 513. In determining this, all the

---

[12]    An agency may choose an applicant because the agency views that applicant as a "better fit." *See, e.g.,   Briggs v. Potter,* 463 F.3d 507 (6th Cir. 2006); *Arraleh v. County of Ramsey,* 461 F.3d 967 (8th Cir. 2006); *Mills v. Health Care Service Corp.,* 171 F.3d 450 (7th Cir. 1999).

evidence may be considered in light of the total circumstances to determine whether that evidence creates an inference of discrimination. *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1289 (D.C.Cir. 1988) (en banc). Such evidence may consist of the combination of (1) the *prima facie* case; (2) any evidence the Complainant presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the Complainant. *Id.*

The Library did not identify precisely what skills and abilities possessed by Ms. Hayes constituted a "better fit" for the Library than Complainant's. (ROI Ex. 12, Response No. 51), Considering all the evidence in light of the totality of the circumstances, we examined the Position Description, the Vacancy Announcement, the KSAs (ROI Ex. 11), the applications of Complainant (ROI Ex. 18) and Ms. Hayes (ROI Ex. 19), the contemporaneous interview notes of the IP panel (ROI Exs. 23-30 inclusive), and the contemporaneous written justification supporting the selection of Ms. Hayes (ROI Ex. 34) to see if there was support for the Library's articulated reason. Cf. *Aka,* 156 F.3d at 1289.

The Position Description and the Vacancy Announcement show that the duties of the Director of Workforce Diversity are primarily to focus on recruitment initiatives to reach diverse labor pools of potential applicants and increase diversity at the Library, and that other duties include managing the Library's EEO complaints and Dispute Resolution offices. (ROI Ex. 11). The KSA appear reasonably calculated to measure the candidate's experience and ability in performing those duties. *Id.* [13]

---

[13]   In the absence of discrimination a factfinder is to defer to the employer's decision of what nondiscriminatory qualifications it will seek in filling a position and not second-guess how an employer weighs particular factors in the hiring decision. *Jackson*, 496 F.3d at 708-709; *Barnette*, 453 F.3d at 17; *Stewart*, 352 F.3d at 429. Nothing in the record suggests any discrimination by the Library in the setting of the qualifications for the position or the KSAs.

Both Complainant and Ms. Hayes received similar ratings from the ratings panel on each of the KSAs used to judge candidates' qualifications. For instance, they received identical IP scores on the following KSAs: (1) Prior Background and Experience; (2) Ability to Lead and Manage Workforce Diversity, Equal Employment Opportunity, Dispute Resolution and Accommodations Programs in a Federal Environment (critical KSA); and (3) Ability to Communicate in Writing. Complainant scored slightly better than Ms. Hayes on (1) Knowledge of Federal Equal Employment Opportunity and Affirmative Action Laws, Regulations, Policies, and Procedures and Diversity Strategies (critical KSA) and (2) Ability to lead and manage a workforce, while Ms. Hayes scored slightly better than Complainant on (1) Ability to interact collaboratively with others (critical KSA); (2) Ability to communicate orally and (3) Ability to analyze organizational and operational problems and develop solutions to improve business performance. (ROI Ex. 29; ROI Ex. 30).

To measure whether the IP scoring of Complainant and Ms. Hayes could be "incorrect or fabricated" we examined their KSAs statements. *See Jackson*, 496 F.3d at 707; *Holcomb*, 433 F.3d at 898. With regard to particular KSAs, they showed the following:

Ability to analyze organizational and operational problems and develop solutions to improve business performance

In her KSA statement, Ms. Hayes wrote of her experience at the Library serving on the agency's Strategic Planning Working Group. (ROI Ex. 19). The Complainant wrote of his having suggested to Department of Treasury executives that they install recruiting kiosks at selected post-secondary institutions. (ROI Ex. 18). The IP panel gave Ms. Hayes a total score of 11, and Complainant a total score of 9, on this KSA. (ROI Ex. 29; ROI Ex. 30).

<u>Ability to Lead and Manage Workforce Diversity, Equal Employment Opportunity, Dispute Resolution and Accommodation Programs in a Federal Environment</u> **

Ms. Hayes wrote of her experience in heading the Library's Affirmative Action and Special Programs Office and serving as Chief, Policy and Planning, at the Defense Intelligence Agency , and that she was "extremely familiar" and had "expert knowledge…. of EEO and civil rights law." Ms. Hayes also wrote that she was responsible for managing and leading numerous special programs at the Library, such as Federal Women's Program, Targeted Recruitment Programs, and the Library's Affirmative Employment Program and Multi-Year Affirmative Employment Program Plan. (ROI Ex. 19).

Mr. Ponce described duties including managing the Disability Employment Program Manager and the Alternative Dispute Resolution Manager in the performance of their duties, coordinating the preparation and execution of various documents, hosting training on reasonable accommodations, convening task forces, and serving as an agency coordinator on inter-agency committees. He also described having processed EEO complaints, including writing acceptance and proposed disposition final agency decisions, reviewing proposed settlement agreements and reports. (ROI Ex. 18). Complainant and Ms. Hayes received identical total scores from the IP on this KSA. (ROI Ex. 29; ROI Ex. 30).

<u>Ability to communicate in writing</u>

Ms Hayes wrote that she had written numerous documents, reports, correspondence that were distributed to a diverse audience, and wrote a "management decision package to request funding . . ." (ROI Ex. 19). Mr. Ponce described writing various letters, a survey documenting Hispanic representation in grades GS-13 through SES in the federal sector, preparing a Power Point briefing, various position papers, two reports, providing written comments on a proposed Department of Commerce policy statement, preparing a directory of paid internship programs,

re-designing and re-writing an annual report on education-related programs in federal agencies, and articles on diversity and civil rights initiatives. (ROI Ex. 18). Complainant and Ms. Hayes received identical total scores from the IP on this KSA. (ROI Ex. 29; ROI Ex. 30).

<u>Ability to lead and manage a workforce</u>

Ms. Hayes wrote of her duties as current Chief of the Library's Affirmative Action Special Programs Office, stating that she was responsible for providing leadership to a team of diverse individuals responsible for implementing the Library's special emphasis, affirmative employment, targeted recruitment, intern, disability, affirmative action and tuition support programs. She wrote that upon assuming that position she reviewed the position descriptions for all staff and determined that a number of them were obsolete and she redesigned them to match the needs of the Library and the office. (ROI Ex. 19).

Mr. Ponce wrote that he prevailed upon a Department of Commerce EEO Manager to assume the duties of the Affirmative Action and Disability Program managers upon their retirement,  and that he successfully convinced his agency to eliminate one of the positions and upgrade the remaining position to a GS-15. (ROI Ex. 18). Complainant and Ms. Hayes received identical total scores from the IP on this KSA. (ROI Ex. 29; ROI Ex. 30).

<u>Knowledge of Federal Equal Employment Opportunity and Affirmative Action laws, regulations, policies, and procedures and diversity strategies **</u>

Ms. Hayes wrote that as the current manager of the Library's Affirmative Action Special Programs Office she was responsible for advising management on the status of the Multi-Year Affirmative Employment Program Plan, the special emphasis programs and the affirmative action programs, and that she successfully coordinated a diversity summit for Library managers, supervisors and leaders. She also wrote that as a former Senior EEO Manager with the Department of Defense, she was the agency's senior diversity program manager, was the

principal advisor to the Agency head, senior managers, the EEO Director, and other management officials, and monthly advised the agency on how to achieve diversity in its workforce. (ROI Ex. 19).

Mr. Ponce wrote that he coordinated the development of the program plan and guidance for persons with limited English proficiency (LEP) and managed the LEP program at Commerce. He also wrote that he attended meetings of an inter-agency council "Points of Contact for Emergency Preparedness and People With Disabilities," assisted the Office of Security with updating the section of Commerce's Occupant Emergency Plan dealing with evacuating employees with disabilities. (ROI Ex. 18). The IP panel gave Ms. Hayes a total score of 11, and Complainant a total score of 9, on this KSA. (ROI Ex. 29; ROI Ex. 30).

We also examined the remainder of their applications and the notes of the Interview Panel members, and found nothing supporting a conclusion that those documents evidenced that Complainant's knowledge, skills and abilities were "significantly better" than Ms. Hayes. (ROI Ex. 18; ROI Ex. 19; ROI Ex. 23-30 inclusive). Thus, the Position Description, the Vacancy Announcement, the KSAs, the applications of Complainant and Ms. Hayes, and the interview notes do not establish by a preponderance of the evidence that Complainant was significantly better qualified than Ms. Hayes so as to support an inference of discrimination from his non-selection. *See Aka*, 156 F.3d.1284. [14]

However, during the course of this investigation, the Complainant alleged that Ms. Hayes may have exaggerated or falsified her credentials on her application. The Complainant, who

---

[14]  Although Complainant clearly believes he is far better qualified than Ms. Hayes, the subjective belief of the applicant as to his qualifications is irrelevant to a determination of whether he was the victim of discrimination in his non-selection. *Montgomery v. Chao*, 495 F.Supp.2d 2, 14 (D.D.C. 2007); *Thompson v. Rice*, 422 F.Supp.2d 158, 180 (D.D.C. 2006).

had been Ms. Hayes direct supervisor while she was at the Department of Commerce and was

familiar with her duties there, asserted that she did not perform the duties described in the

Library's announcement of her selection. (ROI Ex. 35).[15]  In her application for Director of

Workforce Diversity, Ms. Hayes described her duties at Commerce as:

> Deputy Division Chief and Minority Serving Institutions (MSIs) Program Manager.  Ms.
> Hayes currently serves as the Deputy Division Chief and the MSIs Program Manager for
> the Department of Commerce, Office of the Secretary, Office of Civil Rights (OCR), and
> the Deputy Division Chief of the Policy and Evaluation Division, OCR.
>
> As the Deputy Division Chief (and she has serves [sic] in the capacity of Division Chief
> during his absence), Ms. Hayes is responsible for managing senior EEO personnel
> responsible for the Department's Affirmative Employment Program, Disability Program,
> Alternative Dispute Resolution Program, Special Emphasis Program, and other related
> EEO programs.
>
> As the MSI Program Manager, Ms. Hayes is the principal advisor to the Secretary and
> Deputy Secretary of Commerce, the Chief Financial Officer and Assistant Secretary for
> Administration, the Deputy Assistant Secretary for Administration, and the Office of
> Civil Rights on all issues relating to the Department's efforts to assist all MSIs
> (Historically Black Colleges and Universities, Tribal Colleges and Universities, Hispanic
> Serving Institutions and Alaskan Native Serving Institutions.)
>
> . . . Ms. Hayes was the team leader for the Department's Excess Equipment Donation
> Programs to MSIs . . .

(ROI Ex. 19).

In an affidavit submitted to the PAB/OGC during this investigation, Mr. Ponce wrote:

> 4.  One of the employees I supervised at the Department of Commerce was Deborah
> Hayes, who was my direct subordinate from October 2001 through May 27, 2005.  Ms.
> Hayes was an Equal Employment Manager, GS-0206-14, and had primary responsibility
> for serving as the manager of the Minority Servings Institutions (MSI) program.  In that
> capacity, Ms. Hayes was the Department's point person in preparing reports to the White
> House Initiatives on the MSI program.  Ms. Hayes also put together two technical

---

[15]   That announcement stated that "Prior to coming to the Library, Ms. Hayes served as Senior
EEO Manager for the Department of Commerce, where she was the principal advisor to the
Deputy Secretary of Commerce, the Chief Financial Officer, and the Assistant and Deputy
Assistant Secretary of Administration." (ROI Ex. 35).

assistance workshops relating to various Commerce Department functions. Ms. Hayes was also responsible for the planning of the African-American heritage month and Women's month programs, and she coordinated a Diversity program once.

Ms. Hayes was not a supervisor. On those few occasions when I was absent from the office, Ms. Hayes and another GS-14 rotated as Acting Director of the Policy and Evaluation Division. During the times that Ms. Hayes acted in my absence, her responsibility was simply to ensure the continuity to the work of the Division. Ms. Hayes never had responsibility for approving leave, rating the quality of the work products, or issuing performance appraisals. Ms. Hayes was not responsible for supervising senior EEO personnel, was not a Deputy Division Chief (the Department does not now and did not then have Deputy Division Chiefs) and did not serve as a senior advisor to either the Secretary or the Deputy Secretary of the Department. Ms. Hayes was the senior advisor only to myself, and secondarily to Ms. Aramaki, primarily on the MSI and Federal Women's programs matters. I, as the Director (previously Chief) of the Policy and Evaluation Division, served as the senior advisor to Ms. Aramaki on matters relating primarily to MSIs, affirmative action, policy, special emphasis programs, and statistics.

*See Affidavit of Jorge Ponce dated July 24, 2007 with attached email to Frank J. Mack* (ROI Ex. 36).

We obtained an affidavit from Ms. Suzan Aramaki, who had been Ms. Hayes' second-level supervisor at Commerce. [16] Ms. Aramaki stated that:

2. I know Ms. Deborah Hayes by virtue of her having worked in the Office of Civil Rights, in Mr. Ponce's Division. Ms. Hayes was one of the Division's EEO program managers from approximately April 2002 until May 2005. In that capacity, Ms. Hayes reported directly to Mr. Ponce, although she worked on projects with me from time to time. Mr. Ponce was responsible for evaluating Ms. Hayes and issuing her performance ratings.

3. As an EEO program manager, Ms. Hayes had primary responsibility for overseeing the Minority Serving Institutions (MSI) Programs, and some of the cultural awareness events such as African-American History Month and Women's History Month.

4. Ms. Hayes did not manage senior EEO personnel, and had no supervisory responsibilities such as issuing performance appraisals, approving leave, or assigning the day-to-day work of the Policy and Evaluation Division staff. It is possible that during her time at the Department, Ms. Hayes may have overseen the work of one or two interns, although I do not recall the specific interns. It is also possible that Ms. Hayes had shared responsibility for the Special Emphasis programs, but such duties were not supervisory in nature.

---

16   In her application Ms. Hayes had identified Ms. Aramaki as her supervisor.  (ROI Ex. 19).

5. Ms. Hayes did not hold the job title of Deputy Division Chief in the Office of Civil Rights. During my tenure the Office has had no such job title.

6. Ms. Hayes was not the principal advisor to the Secretary and Deputy Secretary, the Assistant Secretary for Administration or the Deputy Assistant Secretary for Administration on issues relating to the Department's efforts to assist MSI . . . I am the advisor to the ASA, and ASA in turn is the senior advisor to the Secretary and Deputy Secretary on all civil rights matters, including MSIs. Ms. Hayes contact with the Deputy Secretary and Secretary was limited, although she may have been involved in briefing them on MSI issues.

7. While Ms. Hayes was involved in the Excess Equipment Donation Program to MSIs, she did not hold the title of "Team Leader" of that Program.

*See Affidavit of Suzan Aramaki dated August 13, 2007* (ROI Ex. 37).

The preponderance of the evidence thus supports the conclusion that, at a minimum, Ms. Hayes exaggerated her Commerce Department duties in her application, particularly as they related to her supervisory experience and level of responsibilities. [17] The record also shows that in selecting her, the Library relied in part on those qualifications that she misstated in her application. For example, in an undated "Justification" supporting Ms. Hayes' selection Mr. Scott wrote:

> Ms. Hayes brings a wide range of knowledge and experience in workforce diversity activities, including affirmative action, special programs, dispute resolution and equal employment opportunity, that will enable her to build on the progress made in creating a fair, diverse and open work environment. All three panel members evaluated Ms. Hayes as being the most knowledgeable in the laws, policies and procedures in the civil rights arena and assessed her as having the greatest ability to interact with others in the affirmative action, alternative dispute resolution and equal employment opportunity areas. [18]

---

17   Although the application itself contained inaccurate information regarding Ms. Hayes' Commerce Department duties, her KSA statements did not reference those duties. (ROI Ex. 19).

18   As detailed below, the assertion regarding all three panel members' evaluation of Ms. Hayes is somewhat inaccurate.

> . . . Prior to coming to the Library, Ms. Hayes served as Senior EEO Manager for the Department of Commerce, where she was the principal advisor to the Deputy Secretary of Commerce, the Chief Financial Officer, and the Assistant and Deputy Assistant Secretary for Administration. . . Ms. Hayes' background and forward thinking on workforce diversity will play a critical role in the development and recruitment of staff who will help achieve the Library's goal for the 21st century."

(ROI Ex. 34).

And, as noted above, the Library's announcement of Ms. Hayes' selection emphasized her inaccurately described duties at Commerce. (ROI Ex. 35).

However, the test for pretext is not whether the Library's articulated reasons for the selection were correct, but, rather, whether the Library *believed* they were correct. *McNally v. Norton*, 498 F.Supp.2d 167, 183-4 (D.D.C. 2007) (emphasis added). We thus examined whether there was any evidence that the Library knew–or should have known–of Ms. Hayes' exaggerations.

The IP panel's notes of the Hayes interview reflected that her Commerce Department duties arose only in response to the panel's question regarding KSA No. 4., i.e., "Ability to Analyze Organizational and Operational Problems and Develop Solutions to Improve Business Performance." The IP had asked Ms. Hayes to

[d]escribe a time when you were faced with a critical or complex organizational and operational problem in your current or previous job and needed to resolve it. Briefly describe the problem, the process you used to resolve it and your ultimate solution.

Mr. Scott's notes reflected that Ms. Hayes stated that at the Commerce Department she rebuilt affirmative action participation for the Department, held workshops with agencies, held meetings with managers, and apparently was able to obtain increased funding for affirmative action. (ROI Ex. 12, Response No. 4; ROI Ex. 26, at 16). Ms. Marcum's notes reflected that in response to the same question Ms. Hayes said that "less than 1 % of contract dollars awarded by the

Commerce Department." (ROI Ex. 22, Response No. 26(A)(5); ROI Ex. 29, at 16).  Mr.

Sandate's notes of the Hayes interview contained no reference to her Commerce Department

duties. (ROI Ex. 30).  Thus, the IP Panel's exploration of Ms. Hayes' Commerce Department

duties was very limited.

Because Ms. Hayes had initially been hired by the Library as the Director of its

Affirmative Action, Special Programs Office (AASPO) in 2004, we examined whether there was

any evidence that the Library knew-or should have know-at that time of the true extent of her

Commerce Department duties.  We noted that her application for the Director of Workforce

Diversity Position (ROI Ex. 19) was identical to her application for the AASPO position.  *See*

*Application of Deborah Hayes dated 12/3/04* (ROI Ex. 38).  Therefore, we asked Mr. Sandate-

who had been the Selecting Official for that position- questions regarding his knowledge at that

time of Ms. Hayes' credentials, including whether he conducted a reference check on Ms. Hayes,

any information he obtained on her Commerce Department duties during such a check, and what

information, if any, regarding Ms. Hayes he shared with Mr. Scott, who was the Selecting

Official for the position at issue.  Mr. Sandate declined to answer, stating that he considered the

requested information "irrelevant" to the selection at issue.  (ROI Ex. 8, at 11).

We obtained an undated reference check of Ms. Hayes conducted with Mr. Ponce in

regards to her application for the EEO Manager position.  That check focused only on the skills

of Ms. Hayes and not her Commerce Department duties. *See Ponce undated reference check.*

(ROI Ex. 39).  Similarly, a reference check of Ms. Hayes conducted with Ms. Aramaki in April

2005, also focused only on Ms. Hayes' skills and not her duties.  *See Aramaki reference check*

*dated April 8, 2005.*  (ROI Ex. 40).  An undated and unsigned justification for Ms. Hayes'

selection for the EEO Manager position does reference her purportedly serving as "Deputy

Division Chief . . ." at the Commerce Department, *see undated Justification* (ROI Ex. 41), but nothing in the record evidences that the Library relied upon anything other than her self-description of those duties in her application for the EEO Manager position.  (ROI Ex. 38).

Thus, the record does not establish by a preponderance of the evidence that the Library knew or should have known of the true nature of Ms. Hayes' Commerce Department duties when it considered her for the Director of Workforce Diversity position.  Because Complainant and Ms. Hayes appeared comparably qualified for that position, we do not infer discrimination from his non-selection based on a comparison of their qualifications.  *See Jackson*, 496 F.3d at 707(when an employer says it makes its hiring decision based on the relative qualifications of the candidates, a factfinder would not usually infer discrimination on the basis of a comparison of qualifications alone if the candidate's qualifications were relatively close); *Aka*, 156 F.3d at 1294(same).

However, "A [Complainant] attacking a qualifications-based explanation is of course not limited to comparing his qualifications against those of the successful candidate....[but] can instead seek to expose other flaws in the employer's explanation . . ." *Aka* 156 F.3d at 1295.  We thus examined whether there was other evidence which would tend to undercut the Library's asserted reason for selecting Ms. Hayes.

We examined the vacancy announcement posting process, the Job Analysis Panel process, the Interview Panel process, and the selection process to see if there was any evidence suggesting that discrimination was a factor in the selection at issue.  We noted that there had been some confusion regarding which KSA factors were to be used in evaluating the applicants.  For instance, the Crediting Plan/Applicant Questionnaire indicates that the JA Panel approved six KSAs and assigned them following weight:

Ability to analyze organizational and operational problems and develop solutions to improve business performance; weight 2;

Ability to lead and manage Workforce Diversity, Equal Employment Opportunity; Dispute Resolution and Accommodation Programs in a Federal Environment; weight 3;

Ability to interact collaboratively with others; weight 3;

Ability to communicate in writing; weight 2;

Ability to lead and manage a workforce, weight 2;

Knowledge of Federal Equal Employment Opportunity and Affirmative Action laws, regulations, policies, and procedures and diversity strategies, weight 3.

(ROI Ex. 14)

The Job Analysis Worksheet-upon which the JA Panel was to document its conclusions-listed the additional KSA "ability to communicate orally" and assigned that KSA a weight of 2. (ROI Ex. 13). The Vacancy Announcement did not list "ability to communicate orally" as a KSA (ROI Ex. 17), but the Structured Interview Guides (ROI Ex. 23-30 inclusive) and the rating forms (ROI Ex. 29; ROI Ex. 30) contained that KSA, as well as the KSA "Prior Background and Experience," which also had not been listed on the Vacancy Announcement (ROI Ex. 17). However, the record shows that each of the applicants was evaluated based on the same eight KSAs. (ROI Ex. 23-30 inclusive). Thus, there is no inference of discrimination from these anomalies in the rating process. *See Fischbach v. District of Columbia Dept. of Corrections*, 86 F.3d 1180 (D.C.Cir. 1996).

We also noted that the Library erroneously scored both the Complainant and Ms. Hayes. Complainant's total rating for KSA No. 5 was incorrectly recorded by the Library as 18, rather than the correct score of 20, causing the Library to list Complainant's Total as 157 rather than the correct 159. (ROI Ex. 29). Furthermore, the IP assigned the wrong weight to KSA No. 4 "Ability to Analyze Organizational and Operational Problems and Develop Solutions to Improve

Business Performance."   Both the Crediting Plan/Applicant Questionnaire and the Job Analysis Worksheet indicated that KSA No. 4 was assigned a weight of 2, (ROI Ex. 13; ROI Ex. 14), and the Vacancy Announcement did not indicate that this was a critical KSA (ROI Ex. 17).  Yet, for reasons not found in the record, the Library gave it a weight of 3 when scoring the applicants, (ROI Ex. 29; ROI Ex. 30).  Thus, when calculating the Final Score, the Library incorrectly used 18 as the sum of KSA weights, rather than 17, resulting in an inaccurate scoring of Ms. Hayes and Mr. Ponce.

These errors are of no significance because when corrected, Complainant's  Final Score is 3.1, and Ms. Hayes' Final Score is 3.3 – the same point spread as calculated by the Library. Thus, that scoring error does not support the conclusion that the Library's explanation for selecting Ms. Hayes was a pretext for discrimination.  *See e.g., Fischbach*, 86 F.3d. 1180; *Johnson v. Lehman*, 679 F.2d 918 (D.C.Cir 1982).

However, other evidence suggests that the Selecting Official, Mr. Scott, may have inappropriately tilted the scales towards Ms. Hayes' selection based on discriminatory motivation. For instance, in his written justification of her selection, Mr. Scott wrote "All three panel members evaluated Ms. Hayes as being the most knowledgeable in the laws, policies and procedures in the civil rights arena and assessed her as having the greatest ability to interact with others in the affirmative action, alternative dispute resolution and equal employment opportunity areas . . ." (ROI Ex. 34).  This is not quite accurate.  For the critical KSA No. 2 - Knowledge of Federal Equal Employment Opportunity and Affirmative Action Laws, Regulations, Policies, and Procedures and Diversity Strategies - the IP rated Mr. Ponce one point higher than Ms. Hayes.  The IP did rate Ms. Hayes two points higher than Mr. Ponce in critical KSA No. 7- Ability to Interact Collaboratively With Others (ROI Ex. 29; ROI Ex. 30) - but the benchmarks

supporting that KSA do not characterize that interaction as "with others in the affirmative action, alternative dispute resolution and equal employment opportunity areas." (ROI Ex. 23-30 inclusive, at 23).  For KSA No. 3, which is most directly related to affirmative action, alternative dispute resolution and equal employment opportunity areas, the IP scored Mr. Ponce and Ms. Hayes equally. (ROI Ex. 29; ROI Ex. 30).

Mr. Scott's mischaracterization of the IP's scoring could be viewed in isolation as a meaningless error.  However, when considered with other evidence it becomes more probative. *See Aka*, 156 F.3d. 1284.  For instance, in his notes of the reference check on Ms. Hayes that he conducted, Mr. Scott wrote that Ms. Aramaki said:

> "Deborah [Hayes] was an outstanding employee- a cut above her peers.  She was truly exceptional;" "Deborah was most adaptable and flexible to changing work situations. She was a jack of all trades.  She had a thirst for learning.  She has developed an amazing ability to motivate people.  She mentored a junior employee who achieved two grade level promotions as a result of her help." "[Ms. Hayes] is a natural leader.  Doesn't need to be motivated.  Great sense of humor.  Understands the chain of command." "Patient. Understands that people have different abilities and works to get the best out of others.

(ROI Ex. 33)

Ms. Aramaki states that Mr. Scott's notes are inaccurate.  In her affidavit, Ms. Aramaki wrote of that reference check:

> Although the document generally reflects some of my opinions about Ms. Hayes, some of the terminology ascribed to me appear to be words and phrases that I do not typically use. For instance, the [reference check] document indicates that I called Ms. Hayes a "jack-of-all-trades."  This is not a phrase I use.  The document also indicates that I said Ms. Hayes was "patient" and "a cut above her peers."  I do not believe I characterized Ms. Hayes in these ways.  The document also indicates that I told the caller that Ms. Hayes mentored a junior employee who achieved a two grade level promotion as a result of Ms. Hayes' help.  I do not recall drawing this conclusion.

(ROI Ex. 37).

Here too, when viewed in isolation, Mr. Scott's re-casting of Ms. Aramaki's comments regarding Ms. Hayes could be viewed innocently, perhaps as his shorthand way of transcribing

her comments. However, when viewed in a continuum, it adds to the weight of evidence suggesting that Mr. Scott stacked the deck in favor of Ms. Hayes. *Aka*, 156 F.3d. 1284.

Adding further to that weight is Mr. Scott's unexplained early termination of a Hispanic male's temporary promotion the Director's position, and his unexplained extension of Ms. Hayes' temporary promotion to that position –events which occurred prior to Ms. Hayes' interview for the position. Specifically, effective June 11, upon Mr. Sandate's retirement, Mr. Scott temporarily promoted a male Hispanic Library employee to the position of Acting Director of the OWD for a period not to exceed forty-eight days, i.e., July 29. *See Notification of Personnel Action effective June 11, 2006*. (ROI Ex. 42). On or about July 7, Mr. Scott approved the termination of that temporary promotion effective July 22 (s*ee Notification of Personnel Action effective July 22, 2006* (ROI Ex. 43), and, effective July 23, 2006, temporarily promoted Ms. Hayes to the position for a period not to exceed forty-five days, i.e., September 5, 2006. *See Notification of Personnel Action effective July 23, 2006*. (ROI Ex. 44). Ms. Hayes was interviewed on August 15, (ROI Ex. 30), apparently selected by Mr. Scott on August 21, (ROI Ex. 31, at 3), and had her temporary promotion extended on August 25 until September 17, an additional twelve days. *See Notification of Personnel Action effective September 6, 2006* (ROI Ex. 45. On September 17, Ms. Hayes was permanently promoted to the position of Director of Workforce Diversity. *See Notification of Personnel Action effective September 17, 2006* (ROI Ex. 46).[19]

---

[19]   The "Notifications of Personnel Action" implementing these actions lists the Director of Human Resources as the "Approving Official" and do not explicitly show that Mr. Scott requested the actions be taken. However, the OWD is subsumed under Mr. Scott, to whom the Director reported, so it is reasonable to assume that he requested these actions be taken.

During our investigation, we asked Mr. Scott by interrogatory to explain the reasons behind the early termination of the temporary promotion of the Hispanic male, and the extension of Ms. Hayes' temporary promotion. Mr. Scott did not respond to our questions. (ROI Ex. 12). Thus, the record is devoid of any explanation of these actions. "When a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him . . . " *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) v. National Labor Relations Board*, 459 F.2d 1329, 1336 (D.C.Cir.1972); *Arvin-Edison Water Storage Dist. v. Hodel*, 610 F.Supp. 1206 (D.C.D.C.,1985). Here, Mr. Scott has information relevant to this investigation, and failed to provide it. This failure to produce such evidence "not only strengthens the probative force of its absence but of itself is clothed with a certain probative force." *International Union (UAW) v. NLRB*, 459 F.2d at 1336 (internal citations omitted.)

In the absence of any explanation for not responding to our questions, we draw an adverse inference that the requested information would have reflected unfavorably on the Library.[20] We note that the information was requested of Mr. Scott via interrogatory, a format which limited the ability of the investigator to timely ask follow-up questions to ascertain the reason for Mr. Scott not providing the information.[21] We note, in this regard, that the PAB/OGC asked the Library to make Mr. Scott available for interview prior to his departure from the Library. (ROI Ex. 6). The Library declined to do so without explanation notwithstanding that

---

[20] It appears unlikely that Mr. Scott overlooked those questions because his interrogatory responses answered other questions that were on the same page as the questions relating to the temporary promotions.

[21] We served the Library with interrogatories for Mr. Scott to answer on August 10, 2007 (ROI Ex. 12), and did not receive a response to those interrogatories until November 1, 2007.

§14E of Library of Congress Regulation 2010-3.1 mandates that ". . . a staff member <u>shall</u> appear as a witness when requested to do so, whether that request be made during the investigative or hearing process.  Any staff member so requested who believes that he/she has no firsthand knowledge of the case or nothing of value to contribute, shall, nevertheless, appear and make such statement under oath."  *See Library of Congress Regulation 2010-3.1.*  (ROI Ex. 49). [22]

We also note that Mr. Scott's interrogatory explanation for his selection of Ms. Hayes arguably differs from what he apparently told Mr. Sandate was his reason for selecting her.  In our interrogatories to Mr. Scott we asked "Did the fact that Ms. Hayes was already employed by the Library have any impact on your decision to select her?  If so, describe that impact."  He responded "No." (ROI ex. 12, Response No. 54).  However, Mr. Sandate in his interrogatory responses described a conversation wherein Mr. Scott purportedly told Mr. Sandate that he was selecting Ms. Hayes because:

> . . . she had been highly rated by all the panel members, that she knew the Library and its key players, that she would bring consistency to the programs we had started during my tenure, that she was someone he would feel comfortable working with.  He said that, in the end, it was important that he feel comfortable working with the right person.  He felt that person was Deborah Hayes.  I reiterated that, while I thought Deborah had a good background and could probably do the job, she did not have the same level of senior management experience as some of the other candidates. . .

(ROI Ex. 8, Response No. 42)

When viewed in the totality of the circumstances, Mr. Scott's mischaracterization of the IP's scoring of the Complainant and of Ms. Aramaki's reference of Ms. Hayes, his unexplained early termination of the Hispanic male's –and corresponding extension of Ms. Hayes' - temporary promotion to the Director position, his arguably contradictory explanations for her

---

[22]   The Library likewise declined to make Ms. Marcum, an employee of the Library, available for interview.

selection, and the Library's  unexplained refusal to make Mr. Scott available for interview as

mandated by its regulation, give rise to an inference of discrimination.  *See Aka*, 156 F.3d 1284,

**RECOMMENDATION**

The preponderance of the evidence establishes that the Library's articulated reason for

selecting Ms. Hayes was a pretext for unlawful discrimination based on race, sex, age and

national origin.   Thus, the PAB/OGC recommends that the Library make a determination that

the Complainant was the subject of unlawful discrimination and sustain his Complaint.